## Perry v. Commonwealth.

May 16, 1941.

588

A. M. Caddell for appellant.

Hubert Meredith, Attorney General, and William F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The grand jury of Whitley county indicted appellant, Melvin Perry, accusing him of committing an offense created and denounced by Section 1166 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes, which the indictment alleged was committed by defendant striking and wounding Osa Cox, a woman, with

the intention of killing her, but from the effects of which she did not die. The statute creates a number of offenses which it places in the same category and carrying the same prescribed punishment, among which are malicious shooting and assaulting of another with a pistol or other firearm with the intent to kill, but from which death did not ensue, and the one charged in the instant indictment.

Defendant entered a plea of not guilty, and at his trial he was convicted and punished with two years' confinement in the penitentiary. His motion for a new trial was overruled and from the verdict and judgment pronounced thereon he prosecutes this appeal. In brief of counsel for appellant all of the alleged grounds contained in his motion for a new trial are abandoned, except (1) ''The evidence as to the appellant having any sort of weapon at the time of alleged offense is too vague and uncertain to sustain the verdict,'' and (2) ''under the circumstances of this case the trial court should have given a separate instruction to the jury defining a deadly weapon.''

Defendant and his victim were each residents of the village of Mountain Ash in Whitley County, Kentucky, residing on adjoining lots. About dark on one Saturday evening in January, 1940, the victim, Mrs. Cox, left her home and started to a grocery to obtain her household supplies for the week-end. She had not traveled far until she observed appellant approaching her from the rear, followed by his soon overtaking her. Her description as to how the offense was committed upon her—and as given in her testimony before the jury—was and is: ''I started to go to the store to get sausage for breakfast on Saturday evening just about dark, and I saw him running behind me. If I had thought he was aiming to come and hit me I could have got out of the way. He whipped in front of me and he cursed and said 'No son-of-a-bitch is going to call the law on me'; just as I said 'Melvin what do you mean,' he knocked me in the head and the next I knowed I was over here in town at the Doctor's office, and that is all.''

She was then asked as to the character of instrument with which she was struck and stated that it ''shired'' and that it had holes, or an opening in it through which ran defendant's fingers. On being asked

if she was familiar with metalic knucks she answered in the affirmative and stated that what defendant had in his hands, and with which he struck her, "looked like knucks." She then testified she was not on a mission of making any report against defendant to any officer or had any intention of procuring his apprehension, although she did say that he was drinking that afternoon and had committed some local depredations, one of which was the kicking out of some window lights, but he had done nothing to witness or any of her property. Other witnesses testifying for the prosecution, and who happened to be nearby and saw the occurrence, corroborated the prosecuting witness; but some of them could not say what, if anything, he had in his hand at the time he struck her, although others did see something. Nor did all of those witnesses testify to what defendant said as he approached his victim as did she, since they were not located so that they might hear it. However, the testimony for the commonwealth as a whole abundantly proved the malicious and inexcusable assault made by plaintiff on his victim, as well as the manner of its commission, clearly indicating a malicious as well as destructive intent and purpose on his part.

Defendant in testifying for himself, and in giving his account of how the assault was committed, said: "Well, she had been at 'outs' with me for a long time, and that day I came in, I don't know what was the matter with her; I went on home and I started back to the filling station and she started out, and she said she was going to call the law, and I asked her to go back to the house, and she raised up her hand and had something in her left hand and she raised her hand up and I turned and hit her with my fist—open hand." He positively denied having anything in his hands, and also denied that he was drunk. On being asked as to how bad he hurt her, his answer was: "I don't know. I hit her a pretty hard blow with my hands." The proof furthermore established, without contradiction, that the blow landed on victim's face at one side of her nose, cutting a gash requiring some six stitches by the physician who later treated it, and dislocating nature's adjustment of her nose to one side of her face—the entire effects of which caused the physician to apprehend that possibly some injury had been inflicted to her brain but which X-ray photographs and other tests proved had not oc-

curred. The victim was knocked unconscious and was in the hospital for a considerable period. Defendant testified that he was 28 years of age and on being asked whether his alleged statement by his victim that she intended to "call the law" made him mad, he answered: "Not any more than what I was." He was then asked: "Why did you hit her that hard—hard enough to skin your hand and sprain your wrist? A. Just because I could I reckon."

The only thing which the victim had at that time, according to the testimony, was some miner's checks with which she intended to purchase her household supplies, as hereinbefore stated. The physicians, of course, testified that they could not tell what sort of instrument inflicted the injuries on the prosecuting witness which they later treated, but they clearly indicated that they could not be produced by the bare hand, although it might be possible to have produced them with a clenched fist. From such brief description of how the offense was committed, as taken from the testimony in the case, it is clear that ground (1) is without merit, since the character of wound, the testimony of the prosecuting witness, the corroboration of it by other witnesses, plus the incredible testimony of defendant, indisputably establishes the fact to be that the wound was inflicted with some sort of instrument other than the bare hand, or even by the bare fist of defendant. In such circumstances the question as to whether or not the employed instrument with which the wounding was committed was a deadly weapon becomes a question for the jury under proper instructions; but if the employed instrument is one which in law is such a weapon per se, then no instruction defining what is or what is not a deadly weapon need be given.

The text in 68 C. J. 4, Section 1, in defining what is a "weapon," says: "A weapon is an instrument of offensive or defensive combat, or anything used, or designed to be used, in destroying, defeating or injuring an enemy." The same text points out that in statutes restricting the use of or the concealed carrying of deadly weapons in the manner described in them, and punishing the inhibited violations where the specific weapon or weapons is not named, the statute applies to the named class "or to others of a similar nature." Further along in the same section and on page 11 of the vol-

ume the text says: "Some weapons are so commonly and notoriously used for criminal purposes that the mere unlicensed possession thereof may be made illegal, irrespective of any intent to use the weapons unlawfully. This rule has been applied to a concealable pistol or revolver, a blackjack or sap, a bludgeon, a slung shot, and to metal knuckles." On page 29 of the same volume the text points out that in some statutes the prohibitive act with reference to the concealed carrying, or wounding with, a deadly weapon, is general in its terms, naming no particular instrument which the members of the legislature enacting the statute intended to designate as such inhibited weapon to be embraced within the statute, as it is then said: "Under these statutes it is unlawful to have or carry brass knucks, a razor, a pistol, or other fire arm," etc. To the text referring to brass knucks as embraced within such a statute is cited the case of State v. Hall, 20 Mo. App. 397.

In the case of Martin v. Commonwealth, 257 Ky. 591, 78 S. W. (2d) 786, it became necessary under the facts therein to determine whether or not metallic knucks were or were not deadly weapons, and which question we determined in the affirmative by saying: "Metallic knucks are deadly weapons. See 8 R. C. L. p. 289, Section 310. If Ola were using metallic knucks on Sid with malicious intent to wound or kill Sid, then Ola was committing a felony, and Orville, by using his pistol to protect Ola, shared in the commission of that felony. See Section 1166, Kentucky Statutes."

In the case of Truax v. Commonwealth, 14 Ky. Law Rep. 299 (a Superior Court opinion), it was held that a razor carried upon or about the person concealed was a violation of our statute against carrying concealed weapons which prohibits the concealed carrying of "any deadly weapon, other than an ordinary pocket knife." It will be perceived that no specific weapon is therein mentioned and the only one that is denounced is a "deadly weapon" excluding only "an ordinary pocket knife." We have seen what is and what is not a weapon. Metallic knucks come clearly within that definition, since they are offensive and defensive instrumentalities manufactured only for the purpose of committing offensive or defensive acts. They, therefore, stand apart from any other instrument that may be employed in valuable or useful purposes other than instruments for

offensive and defensive use, and should, therefore, be properly classified with firearms as per se deadly weapons. See, also, annotations to the case of Mitchell v. State of Mississippi, 99 Miss. 579, 55 So. 354, 34 L. R. A., N. S., 1174, Ann. Cas. 1913E, 512.

A more extended discussion could more convincingly establish the proposition that metallic knucks are per se deadly weapons, but what we have said is, in the light of the authorities to which we have referred, considered sufficient for that purpose. We are aware that the Truax opinion, supra, is not necessarily a binding authority on this court, since it was rendered by one inferior to this court; but, nevertheless, if its reasoning is logical and convincing there is nothing to prevent our approving and adopting it as a correct enunciation of the law. In arriving at the conclusion reached therein Judge Yost, who wrote the opinion for that court, said: ''That the Legislature by this broad declaration intended to make it unlawful for the citizen to carry concealed any weapon which is or could be habitually so carried, and with which personal injury could be inflicted, save the one excepted, seems clear. That it was not intended to restrict this list to such weapons or instruments as are made and designated for offensive or defensive purposes, or for the dstruction of life, seems equally clear. Counsel's contention that a razor could not come within the scope and purview of this law, though confessedly a most deadly weapon, because it was designed for a lawful purpose, is not well taken. When and while used, or intended for use as an article of the toilet, it is not nor need not be concealed, but the man who carries it upon his person hidden from the public view, arms himself with a weapon deadly in its nature and merciless in its power to do harm, and is, in our opinion, as guilty of a violation of the law as he who so carries the pistol, dirk or the sling-shot.''

It will be noted that the excerpt contains this language: ''That it [the statute] was not intended to restrict this list to such weapons or instruments as are made and designated for offensive or defensive purposes, or for the dstruction of life, seems equally clear.'' In that language the court inferentially declared that weapons ''made and designated for offensive or defensive purposes'' only were deadly weapons and we have seen that metallic knucks are not only weapons within

the meaning of the law, but also that they have no other purpose than being employed and used as such. Therefore, we conclude that if the proof in this case had clearly shown that Mrs. Cox was struck by defendant with metallic knucks, then no definition of what was a deadly weapon within the meaning of Section 1166 of our Statutes, supra, was required.

However, the testimony as to the character of instrument with which the striking of the witness by defendant was done was not clear and positive and left some doubt as to whether metallic knucks were employed by defendant. In that case it became necessary for a definition of the term "deadly weapon" to be given, and ground (2) urges that no such instruction was given. Under the section of the statute defining the offense (1166) the compiler has attached in notes thereto a great number of cases defining the character of instruction that should be given in such circumstances, and what is the same correct practice is outlined by Judge Stanley in his work on "Instructions to Juries" in Section 843 of that publication. The most correct form of the instruction defining a deadly weapon as contained in the section of the statute here involved (1166) is therein said to be a submission to the jury as to whether the instrument with which the striking was done "was reasonably calculated to produce death when used by a person of defendant's physical strength, and in the manner in which it was used by him on the occasion mentioned in the indictment." The complained of instruction in this case was not as full as that set out by Judge Stanley in his publication and in the cases cited in his notes to that text, but it did require the jury to believe that the weapon was a deadly one "when used in the way and manner employed by defendant," etc.

It will be perceived that "the way" of the employment of the instrument, as well as "the manner" of its use by defendant were each submitted to the jury for its determination of whether or not the instrument was a deadly one, but it did not contain the language that the instrument should be one which "was reasonably calculated to produce death," etc. It, however, did require the instrument employed by defendant to be a "deadly weapon" when employed in the manner described as therein pointed out. In other words, the jury were told, in substance, that the weapon must be found to be a

deadly one only when so used in the "way and manner" employed by the defendant. Although the instructions did not conform strictly to the pattern laid down by Judge Stanley, and the cases to which he referred in his publication, nevertheless it is our conclusion that the issue as submitted to the jury required a finding by it that the weapon employed by defendant was a deadly one only when used in the way and manner employed by defendant in this case, and that it conformed substantially to the patterned instruction approved in the authorities, supra. At most, therefore, the criticism leveled at it by counsel could be classified only as a technical one not affecting defendant's substantial rights.

But it is argued that defendant proved the bad reputation of the prosecuting witness for quarrelsomeness, which was not contradicted by counter testimony, and for which reason it is insisted that no credibility should be attached to her testimony. However, there was no effort to impeach her reputation for truth and veracity, and, though she may have possessed a quarrelsome disposition, that fact would not justify the murderous assault committed upon her person by defendant of the nature and character shown in this case and admitted by the defendant himself; and for which he urges no legal motive whatever—accepting his testimony as literally given by him, although our credulity in that respect is most seriously shaken when defendant asserts that the wounds and injuries which he inflicted on his victim were done and made with his "open hand."

Wherefore, for the reasons stated, the judgment is affirmed.