## Combs v. Commonwealth.

June 19, 1942.

S. M. Ward and John B. Eversole for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Appellant, Burnett Sexton, Viola Crouch and May Trent, were indicted for the murder of Robert McIntyre. Severance was asked, and the Commonwealth first elected to try Sexton, later electing to try appellant, the trial resulting in a verdict of guilty, fixing punishment at death. Motion for a new trial was overruled, judgment entered and reversal sought, chiefly on procedural grounds, as follows:

The court committed prejudicial error (1) in overruling motion for a change of venue, and motion to continue hearing on that motion to a later date; (2) in summoning jurors from an adjoining county without making effort to obtain jury from Perry County; (3) in overruling motion for a continuance; (4) in the manner of selecting a jury; (5) admitting incompetent evidence, and (6) in failing to instruct the jury properly.

McIntyre, in August 1941, was operating a taxi for Joe Lootens of Vicco. Upon failure to show up with the car, following his use of it about August 18, investigation was begun and later the car was found at Gate City, Virginia. McIntyre had been driving for Lootens about two months, working on a 50-50 percentage basis, and had settled up on the night of the 18th.

Cisco Napier, a boy 15 years of age, who knew all the indicted parties, and McIntyre, said that a day or two prior to the time McIntyre's body was found, he saw all the accused near his home; that he heard Viola say she wasn't going home to get her clothes unless they got "Bob McIntyre as the one; if they got Bob she would go, and McCoy said they would get anybody she would like to get." McCoy said: "That man is too big, he is liable to turn on us, and May said the bigger he is the harder he will hit the ground." Another witness heard the same statements, in addition to a statement by some one of the party that "he has got the most money."

Frank Burnett saw Combs and Sexton on Tuesday night "beating an iron pipe in two." Afterwards they went in the direction of Vicco, taking the two pieces of pipe. Another witness, Wesley Thomas, knew all the parties. He saw McIntyre on the Tuesday night at Vicco talking to the four accused persons; they all got in McIntyre's car and went down toward Acup Creek. This witness saw McIntyre later at the undertaker's establishment. He had a three-cornered cut over the left eye, another over the right one; one over the right ear, and one across the forehead, and one each on top and back of the head.

Pole Fields, coroner, knew all the parties. After their arrest he went to the spot where McIntyre's body was found; it had been pushed into a culvert, head first. It was removed at the suggestion of the officer, who found in McIntyre's pockets some Carr's Fork scrip, and 65 cents in coin. This officer had theretofore gone to the Kentucky Virginia line to return the four to Kentucky after their arrest in Virginia, they being in charge of Virginia officers.

Without objection and voluntarily, as the officer testified, "They said Burnett Sexton hit him first and pulled him across the front seat and laid him on the floor between the seats. After they drove some distance he came to and groaned, and Combs picked up the club and hit him two or three licks on the head." They said they killed him to get the car; they thought he had more money than he had, and they took the car to make a getaway, intending to go to Virginia and finally to Canada.

On cross-examination witness said that the parties were delivered to him and another officer after they had been brought across the Virginia line, and that the statements were made without threats, duress, intimidation or promise. While it appears that the testimony above related was not specifically objected to, at the close of the testimony the court overruled a motion to exclude "all of the evidence relative to statements made by Combs or Sexton."

Henry Morris, a Virginia officer, saw Combs on the morning of August 21, driving a Ford car east in Gate City, Virginia. The car side-swiped another car and failed to stop. The officer pursued and arrested the accused and took them to jail; shortly after they were locked up he learned from a trusty that the boys had discuss-

ed·the assault on McIntyre. He brought·them out to·the office and talked to them in the presence of another officer. He said without any other movement on his part, except that he told them he had heard the trusty's ·statement, he asked them if they wanted to repeat it. Over objection the officer made substantially the same· statements made by Fields, adding, however, that Combs·said that after the use of the iron pipe they had put the body in the culvert; taken ʻthe taxi and "come on that· way." He described the car and it tallied with the one owned by Lootens, identifying·the driver's sign and other tags. The officer did not recall whether or not Combs had ·any personal belongings upon search, but Sexton had a Hamilton wrist watch and aʻ billfold in ·which he found McIntyre's operator's license. A search of the automobile disclosed a piece of iron pipe 18 inches long under the front seat of the car, and upon this was found both blood and hair; the pipe was sealed with tape at each end. The officer said that one of the boys told him that this pipe was used in the assault. Broadwater, jailer of Scott County, Virginia, and another Kentucky officer, corroborated Morris, and made it plain that there was no duress, threat or promise. The father of deceased identified the watch and billfold.

The accused did not appear himself as a witness, nor did any of the accused testify. The only witness introduced in behalf of defendant were his mother and father, who testified that ·the son was a coal loader, somewhat addicted to drinking; that he was nineteen years of age; had been married and had one child, but that he and the wife were separated and the child had been living with his sister.

As indicated above, the offense was committed about August 19, 1941. At the examining trial, September 1, parties were held to the grand jury, which convened on September 8, and on the tenth indictment was returned, and the case assigned for the 22nd day of the term. However, before the trial day the appellant filed his petition for a change of venue, on the ground that he could not get a fair trial in Perry County "because there is such feeling and resentment against him; there had been so much discussion of the killing of McIntyre, the state of feeling in the county is so bitter ·against him as to prevent a trial had in Perry County." In support of this plea were affidavits of two citizens· of the county, who

merely said that they had read the statements of appellant and that they were "acquainted with the state of public opinion in Perry County, and believed the statement of the petition to be true."

In response the commonwealth's attorney filed affidavits of three citizens who had heard no expressions indicating that appellant could not obtain a fair trial. Later, Combs by counsel moved the court to continue the hearing of the motion to the succeeding November term. This was accompanied by affidavit of counsel, which in substance said that the defendant and the other accused were arrested shortly after the homicide and brought to Perry County, and immediately transferred to the Clark County jail, later returned to Perry for examination and then confined until trial. It was stated that affiant believed that he "could not have a fair and impartial hearing upon his motion" because of the wide-spread resentment and feeling against the accused, intensified, perhaps, because the news had gone out that the parties had confessed to the killing of McIntyre, and that the motive was robbery; that the taxi drivers were organized for the protection of their interest, and giving several other reasons why he believed that appellant could not have a fair trial.

On October 1, the court inquired of defense counsel if they had additional evidence to offer; none was offered and the court overruled the motion and announced "that so there could be no reasonable grounds for a belief that defendants had not had a fair trial, he would send to an adjoining county for a special venire: There was some discussion as to the county, Leslie, Letcher, Knott, Breathitt and Owsley being mentioned," and the parties indicating that there could be no legal objection to a jury from Owsley County "the court directed a special venire of 50 qualified citizens from that county."

The sole argument of counsel up to this point seems to be based on the ground that the trial judge, rather than exercising the unquestioned discretion on application for a change of venue, acted arbitrarily, citing the case of Patton v. Com., 289 Ky. 627, 159 S. W. (2d) 1006, which cites other cases upholding the rule to the effect that this court will review such complaints and reverse where it appears that the Court acted arbitrarily.

It is not the rule that simply upon filing the plea, supported by affidavits, the court is compelled to accede. Here it is clear that neither petition nor affidavit set up sufficient grounds for a change. As to the denial of motion for continuance on the hearing of the change of venue motion, it is sufficient to say that the supporting affidavit does not present any logical or legal reason justifying a continuation to a succeeding term. In neither instance did the court abuse his discretion in overruling the motions.

Taking up the contention that the court prejudiced the accused in sending to another county for veniremen, it is true that we have held that before the judge should send to another county for veniremen he should be satisfied, following a good faith effort, that it would be impracticable to obtain a jury free from bias in the county of prosecution. Sec. 194, Criminal Code; Alsept v. Com., 245 Ky. 741, 54 S. W. (2d) 337. The Code is silent as to what extent the effort must go, or what constitutes good faith; these terms are explained in William v. Com., 258 Ky. 574, 80 S. W. (2d) 573. See, also, Canter v. Com., 274 Ky. 508, 119 S. W. (2d) 864.

Here there was motion for change with supporting affidavits. The court no doubt correctly concluded that while there was insufficient showing for change of venue, that it was impractical to procure an unbaised Perry County jury. But we need not undertake to point out further why no error was committed, since it is observed from the record that there was no objection to sending to another county, and there is a total lack of effort to show that the jury selected was unfair or impartial.

When case was called, Combs being on trial moved for a continuance. In his affidavit he set out that following his arrest he was sent to Clark County jail for safekeeping. Within a week or two he was informed that his parents had employed counsel to represent him, but that he had had opportunity to confer with counsel on two occasions only. He said he was only 19 years of age; he and his people were without finances, and on the other hand those interested in the prosecution had ample means. He then refers to the fact that the court had directed 50 veniremen from Owsley County for jury service, and after they had appeared a severance was requested and the commonwealth first elected to try Sexton.

The selection of a jury to try Sexton was begun and conducted while all the veniremen were in the courtroom. From that number a jury was selected. In the selection 29 veniremen were examined, 5 were excused peremptorily by the commonwealth and a like number by the court, leaving only 21 to be examined for qualifications, and that the commonwealth purposes to select a jury to try his case from the remainder of the panel.

He further says that ''only this morning'' was he enabled to procure the aid of an attorney, formerly of Owsley County, to aid him in the trial, and when he appeared ''most of the jury had been selected'' from the Owsley County venire to try the Burnett Sexton case. He alleges lack of opportunity to confer with the Owsley County counsel, or to acquaint him with the nature of the case. His chief complaint is that he was, by the procedure manifested, unable to have presented to him for selection the entire venire of 50 of the Owsley County citizens, but was limited to examination of 21. This motion was overruled. There was no motion to discharge the jury or set aside the swearing.

The argument seems to be that the prejudicial error occurred due to the fact that only 21 venirement were tendered for selection by his counsel. The point is made that the selection was made from a ''milled over'' group of prospective jurors. Just how this occurred is not shown by the record, or otherwise, but in so far as the record shows to the contrary there was tendered to accused a fair and impartial jury. There was no request or movement on the part of counsel to have the court direct additional veniremen. We are persuaded that no error in this respect occurred.

The next ground is that the court permitted incompetent evidence to be introduced, and to which objections were made. We have carefully examined the entire evidence, and it is free from error in this respect. There were few objections interposed; these related chiefly to the evidence of the arresting and conveying officers, whose testimony is recited supra, the objection being that the confessions made by the parties were not admissible, because in violation of our statute known as the ''anti-sweating'' law, which we have had before us not infrequently, and which we have upheld and applied, where convinced that officers have overstepped the boundary line. Since neither appellant nor any one of his co-

indictees testified, there was no issue of fact on the point. The officers who testified were in one accord in saying that the statements attributed to the parties were voluntarily made. It is true that on the trip from Gate City, or some point in Virginia, the parties were in charge of officers, the deputy sheriff and deputy coroner, and the officers "talked to them," and "asked them questions," but the record shows clearly that these were only during the conversations among the parties.

Appellant's counsel attacks the instructions rather vigorously. The court gave approved instructions defining technical words and terms. The court then confined the instructions; advising the jury on the law of willful murder, and as to the character and use of the iron pipe as a deadly weapon, and another on the law as to the consideration of a confession, not made in open court, Criminal Code, sec. 240, and the usual reasonable doubt instruction.

The general complaint is that since the evidence was circumstantial, the court prejudiced the rights of accused by not giving the whole law of the case, that is, an instruction on voluntary and involuntary manslaughter and self-defense, an almost universal rule, with certain exceptions. However, counsel apparently overlooked the fact that we have held that where there is a confession, which is not subject to successful attack because improperly obtained, such is treated as substantive, probative evidence, and thus the necessity of giving the whole law is obviated. This ruling is made clear in Tappan v. Com., 245 Ky. 750, 54 S. W. (2d) 333, and similar cases cited in Kentucky Dig. "Homicide," Key 300(9), etc. Here the proof most convincingly showed willful murder.

There was no proof on which to base an instruction on lesser degrees of homicide, or self-defense, and it is unnecessary for us to cite the multitude of cases in which we have held that under such circumstances it was not prejudicial error to fail to give instructions, either on lesser degrees or of defense.

The chief contention, however, is that instruction No. 2 was so structurally bad as to be misleading and of prejudice to appellant's rights. The instruction was in form and substance as follows:

"If you shall believe from the evidence beyond a reasonable doubt that * * * McCoy Combs * * * did

wilfully, maliciously and feloniously, with malice aforethought, and not in his necessary or apparently necessary defense of (other parties named) or any of them, strike and wound McIntyre with an iron pipe, a deadly weapon, from which striking and wounding McIntyre died * * *, or aided, abetted, assisted, encouraged or commanded Burnett Sexton to so strike, wound and kill McIntyre, then you should find him guilty of willful murder, and fix his penalty,'' etc.

The contention here is that the court should have interpolated the words ''wilfully, feloniously,'' etc., as used in the first portion of the instruction where the word ''so'' precedes the words, ''strike, wound,'' etc., in the aiding and abetting portion. This argument is based on the ruling in the case of Moore et al. v. Com., 266 Ky. 514, 99 S. W. (2d) 715, where we held that in prosecutions of defendants as principal and accessory for murder, the omission of the words willfully, feloniously, etc., in an instruction authorizing the conviction of one aiding and abetting another, required a reversal. In this case we traced the rule back to the case of Mickey v. Com., 9 Bush 593, showing wherein we had applied the rule whenever the instruction was so faultily framed as to authorize reversal.

By observation it will be found that the instruction, and others condemned, were clearly objectionable; not properly presenting the law as applied to one aiding and abetting another. In none of these did it appear, in so far as our observation has led us, that the qualifying words ''so striking, wounding,'' etc., were used. We made reference to Anderson v. Com., 193 Ky. 663, 237 S. W. 45, in making a distinction. We said, referring to the instruction in the Moore case:

''The instruction here is distinguishable for the reason that in this instruction there was no use of the words 'in so killing,' and which we found related to the manner and not the method. In view of the distinction, and being of the opinion that appellant, who under the proof was undoubtedly a principal, we are constrained to the conclusion that the jury was in no wise misled, and that no error to defendant's prejudice was committed.''

The court gave an instruction on the character and

use of the iron pipe in consummating the homicide; giving the jury the right to determine whether the pipe, used in the manner it was used, was or was not a deadly weapon. We shall not reproduce it, but the objection is that in form, the court framed it so that it assumed that if appellant did not strike deceased with the pipe, he did assist in aiding or abetting Sexton in the use of the pipe. We do not so construe it, and even if it were so, it would not appear to be prejudicial. Under the proof that death ensued from the use of the iron pipe it was unnecessary to submit to the jury the question as to whether or not it was a deadly weapon. Perry v. Com., 286 Ky. 587, 151 S. W. (2d) 377; Payne v. Com., 289 Ky. 590, 159 S. W. (2d) 430.

It is next complained that the court erroneously gave an instruction embodying the provisions of Section 240 of our Criminal Code, as to the necessity of other proof to warrant a conviction where the alleged confession be not made in open court, the only argument being that the instruction was not necessary, and its giving unduly emphasized the fact that a confession was made, and the confession. The Code requires this instruction as a matter of safeguard to the accused, and while the corpus delicti here was amply proven, it was by an extrajudicial confession, and was correctly given. Hawk v. Com., 284 Ky. 217, 144 S. W. (2d) 496.

Counsel representing appellant has gone to some length and great pains in presenting in briefs, original and supplemental, the contentions of their client. We are impressed by the fact, as they point out, that appellant is a young man, and as far as shown had never before been in serious trouble. These facts, of course, have appeal and have actuated us in giving the contentions close consideration. However, we cannot overlook the fact that the homicide described was inexcusable and merciless, admittedly done for the purpose of illegal gain. There are no palliating circumstances claimed or shown. No contention that the verdict was not the result of due deliberation, rendered without bias, prejudice or aroused feelings. Under such circumstances, we are compelled to and do affirm the judgment.

Whole Court sitting, except Judge Ratliff, who was absent.