## Pruett v. Commonwealth.

(Decided May 1, 1923.)

## Appeal from Lawrence Circuit Court.

1. Homicide—Circumstantial Evidence Held Sufficient to Take Case to the Jury—In a prosecution against defendant for the murder of his father, circumstantial evidence as to tracks, declarations and acts of accused, and motive held sufficient to warrant submitting the case to the jury, though by no means conclusive

2. Criminal Law—Evidence as to Compensation Payable to Deceased Held Objectionable as Hearsay and Secondary.—In a prosecution for homicide, where the motive claimed was desire to obtain the war insurance being paid to deceased, who was defendant's father, testimony by a witness as to the amount of insurance carried by another son of deceased, which was being paid to his father and as to the amount which had been paid on such insurance, though relevant, was incompetent as hearsay or secondary evidence.

3. Criminal Law—Prosecutor's Argument as to Motive Held Unsupported by Competent Evidence.—Where the only evidence as to the amount of war risk insurance being paid to deceased was incompetent, an argument by the attorney for the Commonwealth that the motive of the murder of deceased by defendant was that there was yet $4,500.00 to be paid on the insurance which would go to the defendant, the son of deceased, was improper, evidence of a statement by defendant that he thought he would get the insurance on his father's death being insufficient to justify the argument.

4. Homicide—Testimony at Coroner's Inquest is Admissible.—Where a person testifies at a coroner's inquest voluntarily and without compulsion, proof of his testimony, if relevant, is admissible against him in a subsequent homicide trial.

5. Homicide—Testimony of Person Suspected But not Under Arrest at Inquest is Generally Admissible Without Warning.—As a general rule, testimony given by a person at a coroner's inquest at a time when he was under arrest is voluntary, even though he was under suspicion, and such testimony is admissible against him in a subsequent trial, even though he was not cautioned as to his rights before he gave it, the burden being upon him to

show that the circumstances and the public feeling were such as to amount to a compulsion to testify at the inquest.

6. Homicide—Testimony of Defendant at Coroner's Inquest can be Proved by Parol Evidence of Jurors.—Since the evidence of witnesses at a coroner's inquest is not required to be written out and signed, it is competent to prove it by parol, and proof by members of the jury is competent.

W. T. CAIN, C. F. SEE, JR., and A. O. CARTER for appellant

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, Assistant Attorney General, and FRED M. VINSON, Commonwealth's Attorney, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

Cleve Pruett is accused of the murder of his father, Joseph Pruett. He was tried in the Lawrence circuit court, convicted and sentenced to life imprisonment.

The deceased owned a small mountain farm; he was a widower, sixty-three years of age and lived alone in a double log house, it having two doors on each side, back and front.

The defendant, with his wife and five children, lived on the opposite side of the farm. On May 1st, 1922, the morning of the homicide, deceased took breakfast with them, and it is claimed asked defendant's wife to come to his house and prepare dinner for him as he was suffering from rheumatism. They did go and on their arrival found his lifeless body lying in an angle formed by the western door steps and house wall, his right shoulder being bent under the body and his limbs outstretched. The steps are some thirty inches high, and eight feet from the corner of the house. His hat was six feet north. At the southwest corner there was a small sprinkle of blood, which grew heavier as it reached the door, the panel of which was also streaked with blood. He had received two gunshot wounds, one in the right shoulder, the other in the breast, but the character of weapon with which they were made is not clearly indicated. The defendant ran to the neighbors for assistance and in a short time a number arrived.

It is claimed by the Commonwealth that defendant sought to throw inquirers off their guard by starting them on false trails; that he objected to sending for bloodhounds to track the murderer; that one Liss Branham discovered a track eight feet south of the house, that

showed the impression of round tacks in the heel, and a strip of leather on the inside of the right foot.   Defendant was wearing a shoe of the same size and character. Branham covered this track with a board and traced others through the yard and through a patch of woods to a point near Taylor Branham's barn; one of these in a soft place showed the same indentations as the one above described; that at the coroner's inquest the defendant testified, and said he and his father and his two little boys left his home after breakfast and walked together to where the path forked, and then separated with the understanding that the deceased was going to Clifford, Ky., for the mail; that he and the boys went up the hollow to visit some traps, he carrying a shotgun; that they found no game and were returning home and at a point near Taylor Branham's barn heard two shots.  "Probably," one of the boys said, "grandfather has killed a squirrel," and he said, "No, he did not think he killed it that shot," and about that time he heard another shot and his father's "Hollo," recognizing his voice.  He came back to the latter's cowshed and sent the older boy up to see about his grandfather, and he returned and told him the doors were closed and his grandfather gone; that thereupon he returned home, and with his wife and little daughter went back to his father's house to prepare his dinner.   It is also claimed that the deceased was drawing compensation from the government for the death of a younger son who lost his life in the service; and there was evidence to the effect that this was originally paid to deceased's wife; that at the time of her death, in a conversation between defendant, his father and a neighbor, the defendant stated it as his opinion that at the death of his mother this compensation would be paid to his father and at his father's death to him, and in another conversation he stated that the government had this money for them and at his father's death he would get it.   It is further claimed that on the day after the inquest, at dinner at the home of his uncle, he remarked that he had brought his guns—a gun and pistol—to the inquest with the expectation that they would be called for, but they were not; that at this time he paled and showed great agitation.

At the death of the deceased he had $147.00 in cash on his person; this was given to James Pruett, a brother, who paid the funeral and burial expenses and the small remainder to the defendant.   He also had a bank deposit

of $152.00 which defendant received. It is suggested that at the time an officer proposed to find the murderer if he would offer a reward of $100.00, but that he declined to do this, saying that he needed the money. It is also shown that the defendant was a miner but had been on a strike for some time, and that his allowance from the union had dwindled to $5.50 per week, and he was doing no other work.

For the defendant it is claimed that he and his father were on the most intimate terms and never had any trouble; that he and the boys did go with his father on the morning of the tragedy to where the road forked; that about the time he reached the barn he heard the first shot; that the gun made a long fire, and he said, "I believe he missed it;" that the gun fired again immediately and he heard a voice calling, but could not tell where or whose it was; that he went up to the cowhouse, which is under the hill from the residence, and sent his boy up to see at what his grandpa was shooting. The boy came back and said, "Papa, grandpa ain't here," and he returned home. His wife was going to bake some bread for his father, and he went with her, intending to go on to Kermit, W. Va., for his allowance from the miners' union. When they arrived at his father's residence they found he was dead and he went for assistance. He did have tacks in his heel and a strip of leather on the toe of his shoe, and so told those present, but had walked around in the yard after his arrival and before Branham noticed the track, and in this he is corroborated by others. He did not discourage the idea of getting the bloodhounds, but it was Liss Branham who said, "They can't convict on bloodhound evidence," and in this he is also corroborated. He knew Liss Branham was suspicious of him and trying to implicate him. He also knew his father was drawing a dependent compensation, but that is all he knew about it.

The evidence as to the tracks is quite conflicting. Some of the witnesses saw marks on the rocks pointed out to them by Branham and also along the route traced, and also the indentations in the two tracks mentioned above, while others examined the tracks and were unable to discover the marks.

There is also evidence to the effect that Branham had feeling in the matter, and that he had taken quite an interest in the prosecution, going so far as to pay his expenses to another county to secure witnesses for the

Commonwealth, and defendant claims that he was actuated by ill-will toward him.

The defendant was not arrested or indicted until the second term of court after the killing, although the first grand jury investigated the case. During this time he remained in the vicinity and when he heard of his indictment came and surrendered to the officers. While it is shown that he owned both a gun and a pistol, and on one occasion he had difficulty with one of the Branham's over a cow the latter had locked up, his neighbors gave him a good reputation for peace and quietude.

The evidence of the main facts connected with the homicide is purely circumstantial and in connecting the defendant with the crime it is by no means conclusive, but we have reached the conclusion that it was sufficient to submit the case to the jury.

James Pruett, a witness for the Commonwealth, was asked:

"Q. Tell the jury what insurance, if any, Henry Pruett had at his death, how much was it? A. $6,-000.00. Q. Up to Joe Pruett's death how much had been paid to Joe's wife and Joe? A. I think about $1,500.00."

Objections were made to the questions and exceptions taken to the answers. This evidence was relevant, but as introduced was hearsay, or at best secondary and for that reason the objection should have been sustained.

In his closing argument to the jury the Commonwealth's attorney said:

"Gentlemen of the jury, the motive of this murder by the defendant was that the deceased, Joe Pruett, had a $6,000.00 government policy through his son, Henry Pruett, $1,500.00 of which had been paid, but the $4,-500.00 yet to be collected, which would go to his son, Cleve Pruett, the defendant; this was the motive for the killing." Objections were made, overruled and exceptions taken.

There was no evidence of any kind that the defendant was a beneficiary under the government insurance policy or a dependent on his brother, and the evidence of James Pruett as to the amount of the policy and the payment thereon was incompetent, and yet these matters were stated as facts by an officer of the court in a trial in which it was necessary to prove a motive. The evidence

that defendant said he thought his father would get the compensation, and at his father's death he would get it, was a proper subject of discussion, but did not justify the language quoted. In our opinion this constituted reversible error. Slaughter v. Comth., 148 Ky. 315; Kenton v. Comth., 32 L. R. A. 1164.

It is earnestly insisted that proof of defendant's statements as a witness at the coroner's inquest was inadmissible; that if admissible, proof of it by members of the jury was incompetent.

It might be said that the authorities are in accord to the extent that if a person testifies at the inquest voluntarily and without compulsion, proof of his testimony, if relevant, is admissible against him in a subsequent trial, the divergence being as to what constitutes a voluntary statement. All of our state constitutions contain provisions to the effect that the accused cannot be compelled to give evidence against himself. It is also a familiar principle that a confession secured by hope of reward or fear of punishment is inadmissible in evidence, and these rules are most generally applied in considering the question.

It is practically conceded that if the accused is under arrest at the time of the inquest and is sworn as a witness, without being cautioned as to his privilege, such testimony is involuntary, though if he requests to make a statement or, after being warned, willingly testifies, such testimony is voluntary.

The real difference in the reported cases is as to whether testimony of a person not under arrest but suspected of a homicide and sworn without being cautioned is voluntary. Numerous cases may be found holding that such evidence is inadmissible, some among which may be cited: Tuttle v. People, 70 L. R. A. 33; Twigg v. State (Tex. Crim. App.), 75 S. W. 531; State v. O'Brien, 18 Mont. 1; Standifer v. State (Ct. App. Ga.), 100 S. E. 775; State v. Tapp. (Sup. Ct. S. C.), 89 S. E. 394; State v. Young, 119 Mo. 374.

The argument is that no distinction can be drawn between one under arrest and one suspected of a homicide; that the consequences of his statements are the same in both instances and the reasons which would render one inadmissible would apply to both; that in neither case should it be presumed that he would voluntarily make any statements tending to fasten the crime upon himself,

and his arrest or non-arrest is in no sense a test in determining whether the statement is voluntary or not.

Many cases on this point are collated in a foot note to Tuttle v. People, 70 L. R. A. 33, in which the learned author takes the opposite view, saying:

"The main distinction which has been drawn in the cases is as to the status of the accused at the time the testimony is given. If not under arrest he is by the weight of authority to be treated as any other witness. He is supposed to know the law, and therefore need not be informed of his right to testify in case his answers might incriminate him. If he fails to claim his privilege his testimony is deemed voluntary."

The text is supported by Hendrickson v. People, 10 N. Y. 13; People v. Molineaux, 168 N. Y. 264; 62 L. R. A. 193; Wilson v. State, 110 Ala. 1; Scheffer v. State, 3 Wis. 823; Calugh v. State, 7 Neb. 320; Williams v. Comth., 29 Pa. 102; Mack v. State, 48 Wis. 271; Epps v. State, 102 Ind. 539; Dickerson v. State, 48 Wis. 288, 4 N. W. 321, and many other cases. See also Wigmore on Evidence, vols. 1 & 5, sec. 851, and cases cited.

So far as we are advised the exact question has not been decided in this state. In Sanderson v. Comth., 11 Rep. 342, the statements of defendant before the grand jury were admitted in evidence, but it is not shown under what circumstances he testified, except that there was no confession of guilt. The case of Seaborn v. Comth., 25 Rep. 2204, was where the defendant testified at the examining trial in his own behalf, thus waiving his constitutional privilege.

In the case of Tines v. Comth., 25 Rep. 1233, the acting county attorney procured an affidavit from a suspected person, not under arrest, for the purpose of using it against the unknown perpetrators of the crime. The affidavit was not a confession but the court held it inadmissible.

In the late case of Comth. v. McClanahan, 153 Ky. 412, a case under the anti-sweating act, the court defined the word "voluntary" thus:

"Proof of a confession is never admissible unless it is voluntarily made, and by the word 'voluntary' it is meant that the confession must be made of the free will and accord of the defendant without coercion, whether

from fear of any threat of harm, promise or inducement by hope of reward or method known as sweating.''

While not analogous, the decisions cited indicate the spirit with which this court has approached the question, and the difficulty of laying down an inflexible rule to govern all cases.

The facts, circumstances and state of public feeling might be directed against a suspected person to such an extent as to render the coroner's inquest practically equivalent to an examining trial of the suspect. Under such conditions, if sworn without being cautioned, it could hardly be said that his testimony would be voluntary. But such extreme cases are rare, and to lay down the principle that every one suspected of a crime is immune from testifying as a witness would practically close the door to the investigation of hidden crimes.

We apprehend the correct rule to be that where it is not shown that there was any hope or fear aroused by those connected with the prosecution and a person not under arrest willingly testified at the inquest or examining trial of another, even though suspected and not cautioned, that such evidence is to be considered voluntary; and that in the extreme cases mentioned above the burden would be upon the defendant at the trial to show the existence of compulsion of the inquest.

In this case the defendant was not arrested. It appears that without being subpoenaed he attended the inquest, carrying his guns with him for inspection, and he willingly testified, no compulsion of any kind being shown. We conclude that the trial court properly admitted evidence of that testimony.

In states that require the evidence of the witnesses at the inquest to be written out and signed by them, the signed instrument would be admissible. That is not our practice and it is competent to prove the statements by parol. The same practice is approved elsewhere. Lyons v. People, 137 Ill. 602; 27 N. E. 677; Green v. State (Ga), 52 S. E. 431; Brown v. State, 71 Ind. 470; People v. Curtis, 50 Col. 95.

Judgment reversed and cause remanded for proceedings consistent with this opinion.

Whole court sitting.