# Couch v. Commonwealth.

(Decided Oct. 16, 1934.)

JAMES O. BAKER for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

Martha Couch appeals from a judgment and sentence of two years in the penitentiary upon a charge of murdering her stepdaughter, Susie Couch. The conviction rests upon circumstantial evidence in opposition to the defendant's express denial. Reversal is sought only upon the grounds that the appellant was entitled to a peremptory instruction and that the verdict is contrary to the evidence. So a full statement of the record is proper.

The appellant at the time was about twenty-seven years of age and the deceased stepdaughter about twenty-six years old. They lived with the husband and father and four small children in a two-room box house near the top of Pine Mountain in Harlan county. The only evidence pertaining to the relations of the two young women is that of a neighbor who said that Susie did all the work and "Martha was a little mean to her," and the testimony of the defendant that the state of feelings toward each other was good. The defendant's brother testified that seven or eight years ago he was at the house a good deal and their relations were then all right.

To present the facts somewhat chronologically, we go first to evidence of the defendant, corroborated and not contradicted, that, accompanied by her little girl,

she left home about 11:30 o'clock to take her husband's dinner to him at a sawmill where he was working, about three-fourths of a mile down the mountain trail. He had left home about 6 o'clock that morning. She remained at the mill a little while and then went about a half mile farther to the home of Reuben Maggard and from there back up to her home. This was a little after the 1 o'clock whistle blew. Bradley Shell, introduced by the commonwealth, testified that a short distance before reaching the house, he, in company with Hobert Browning and Walter Creech, passed the defendant, all of whom were walking. When he was about fifty yards beyond the house and she had reached it, she called to him to come back, told him that the girl was shot, and asked him to come and put her on the bed. He found the girl lying in the floor shot in the left hip. From the condition of the blood on the doorstep, it looked to him like it had been there a couple of hours. The defendant was crying. He wanted to lay the girl in the bed, so he testified, but defendant told him not to. At her request he went for her husband. The wounded girl never said a word to him or in his presence. As he passed the house that morning going down the mountain, he saw the girl lying on the floor. The witness was not asked as to what time this was nor whether she was at the same place he found her early that afternoon upon his return. Hiram Couch, the brother of Susie and stepson of the defendant, related that he was working at the mill and when he learned from Bradley Shell that his sister had been shot he went to the house. She was then lying in the bed and except to say that she was shot, "We couldn't get her to talk." He and Bud Williams took her off the mountain to the doctor. The defendant made no statement. He tried to get the sheriff's office that afternoon but could not reach it over the telephone. Williams testified that the defendant said that the girl was not hurt much, "just scamped." Henry Lewis, deputy sheriff, learned of the killing the next morning and went to the house. He found an empty shot gun shell which had been recently shot twenty-five or thirty feet from the house and in the house was a shot gun of the same caliber which had been recently fired. This gun had an old and a new break in it and there was mud on the barrel. There was blood on or at the doorstep and on the floor of the house. The defendant told him that the girl had been killed there by the door; and fur-

ther, "She was talking about it and she said so far as she could find out the Miniard boys shot her and then broke up the shot gun and throwed the shell over a bank and got on a horse and rode off. She talked to all of them." No horse track going back the way she said the Miniard boys had gone was found after diligent search, but there was a mule track going in the opposite direction. He tried to talk to the little children, but the defendant would not let them go off with him. He admitted they were very shy and bashful. Norris Holbrook, a neighbor, related that that morning the accused told him that she thought that Elmo and Bill Miniard had killed the girl while she was sitting on the doorstep and said that she had picked her up and laid her in the bed. He asked her if the girl was in the bed when she came home and she replied, "Yes, she messed up all the beds"; and further, "When I left she could walk as good as you can." She said that the Miniard boys broke the gun and when he asked to see it she brought it out and it had mud on it. Browning, another neighbor, testified to substantially the same conversation, with the addition that when he asked how the girl could have been shot sitting in the door, the defendant replied she must have got up to run. Elmo and Bill Miniard, who live in Leslie county, testified they knew nothing about the killing and were at their home that day. They used the trail passing the house in going to and from Harlan but they did not know the defendant. It appears that they lived only a half mile from the Couches. Ben Miniard testified that he was at home and that he saw Elmo Miniard pass his house about 11 o'clock that day "going up toward the store." Whether or not this was in the direction of Couch's home was not developed. This was all the evidence introduced by the commonwealth.

The defendant testified that when she left to take her husband's dinner to him, Susie was cutting stove wood in the yard. She heard a gun fire while she was going down the mountain and when a short distance from the mill. Upon her return she found the little children outside of the house crying and the girl lying on the floor. She called to Shell to come back, as we have related, but she says that when she asked him to put the girl on the bed he told her he could not touch her, and she sent him after her husband. After saying she was going to die, the girl told her that "the Miniard boys did it." A school teacher came along and gave

her some medicine, said the defendant, and after that her brother and others came. The deceased was not shot or injured in any way when she left for the mill that morning. The shotgun was in the rack in the kitchen when she left. She did not fire it because she did not know how to load a gun and had never shot one in her life. She denied having told Browning that the girl was sitting on the step when shot and that she made any statement that when she left Susie could walk around as good as any one. She denied having tried to keep her little children from talking to the officers. There were some other minor contradictions. In rebuttal, Shell testified that the children were not outside of the house crying. Of course, they could have gone out after he passed. The witnesses who were at the house next morning testified that the defendant told them that the girl would not talk and that she did not know anything except what the little children had told her.

It must be admitted that the evidence is very unsatisfactory. There is much that might have been developed and a number of inquiries suggest themselves. For example, what became of the school teacher, identified as Henry Coleman, who came to the house shortly after the defendant and Bradley Shell got there? He is not accounted for. Nor did Hobert Browning or Walter Creech, who were with Shell, testify on the trial. The trail passing the house was frequently traveled. Others who doubtless knew something of the conditions, and especially of the relations of these young women, which would have thrown some light on the important question of motive, were not produced. It is not shown when or where the girl died. No doctor was introduced, and, except for the opinion of her brother that she died from being shot, there is nothing to show that the wound she had received really caused her death. Indeed, it is not shown that she was shot with the shotgun and shell produced or indeed any shotgun, although that is the reasonable inference from the entire evidence. The jury probably had some doubt as to the defendant's guilt, as is indicated by the minimum verdict they were authorized to return under the instructions. Guilt cannot, of course, be fastened upon one by the process of elimination, but the accused was the only adult in the house where the girl was shot and where the weapon probably used was kept and found afterward. There is her statement that when she left that

morning Susie was able to walk as good as anybody and before her return had "messed up all the beds," which would indicate she well knew then that the girl had been shot but did not regard her wounds as serious. She told one witness the girl had been "just scamped"— doubtless meaning superficially wounded. More indicative of guilt, however, are the contradictions· in her several statements and her inconsistent explanations. The statement of the girl to her alone, as she testified, that the Miniard boys had shot her and gone off on a horse is contradicted by the physical fact that there were no horse tracks on the trail. Although it is by their own testimony that the Miniard boys established an alibi, there is nothing in the record to indicate that they knew these parties or any suggestion of motive on their part.

The defendant's several statements, when properly weighed, refute the truth of this claim,·so that her false stories themselves became a relevant circumstance showing consciousness of guilt. Logan v. Commonwealth, 29 S. W. 632, 16 Ky. Law Rep. 508; Underhill on Criminal Evidence, sec. 201. In Burrill on Circumstantial Evidence, p. 491, it is said:

"Truth is the reliance of innocence. Falsehood is the resort of crime. All true facts are consistent with each other. If the prisoner is innocent there is no reason for withholding a true fact. Still less is there for uttering a falsehood. Falsehood is evidence of crime. Every falsehood uttered by way of exculpation becomes an article of circumstantial evidence of greater or less inculpatory force."

In Cassell v. Commonwealth, 248 Ky. 579, 59 S. W. (2d) 545, we treated at length the subject of conviction upon circumstantial evidence. The rule to be applied, as generally stated, is that if the facts proven may be reasonably reconciled with the presumption of innocence of the accused, guilt is not established. Denham v. Commonwealth, 239 Ky. 771, 40 S. W. (2d) 384; Tarkaney v. Commonwealth, 240 Ky. 790, 43 S. W. (2d) 34. Even under that liberal rule for the accused, it must be remembered that this is a court of review and is not authorized to set aside the verdict of a jury upon the ground that it is flagrantly against the evidence. Wood v. Commonwealth,· 229 Ky. 459, 17 S. W. (2d) 443; Trinlett v. Commonwealth, 245 Ky. 149, 53 S. W. (2d) 348.

As thus measured, we are of the opinion that the verdict cannot be so regarded.

Wherefore the judgment is affirmed.