Amos BROWN, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Feb. 25, 1955.

Rodes K. Myers, Bowling Green, for appellant.

J. D. Buckman Jr., Atty. Gen., John B. Browning, Asst. Atty. Gen., H. G. Davis, Commonwealth's Atty., Elkton, for appellee.

HOGG, Justice.

Amos Brown, 38 years of age, was indicted, tried and convicted in the Logan Circuit Court on the charge of wilful murder of Roy Sears, his brother-in-law, and his punishment fixed by a jury at life imprisonment. On this appeal he seeks a reversal of the judgment, which was pronounced on the verdict, on the following grounds: (1) he was entitled to a directed verdict; (2) there were errors in the admission of evidence and the court's refusal to admit cer-

tain evidence; (3) the court failed to instruct on the whole law of the case; (4) improper and prejudicial argument was made by the Commonwealth's attorney, and (5) the jury was improperly treated by the sheriff and his deputies after the case had been submitted to the jury.

In order to properly evaluate these alleged errors, it will be necessary to review the evidence in this case.

The deceased, Roy Sears, 50 years of age, lived alone on a country road in Logan County, some two miles from the main highway. This road ended a short distance from the Sears' home. He had no relatives, except his sister, who is the wife of the accused, Amos Brown. Carlos Harris, also a bachelor and a close friend of Sears, testified that he occasionally spent nights with Sears and that he stayed with him on the night of Friday, October 17, 1952; that as he was preparing to leave Sears' home the following morning, Saturday, October 18, Brown drove up to Sears' house in his automobile; that the trio talked a few minutes and he and Sears helped Brown start his automobile engine which had quit running; that he then left the two and started walking along the country road toward the highway; that Brown did not pass him while he walked the two miles to the highway, and he observed no other vehicle traffic along the way except a milk truck; that when he left Sears and Brown they were laughing with each other and apparently were on friendly terms.

Neighbors of Roy Sears who lived along the country road testified that they saw Brown drive up the road in the direction of Sears' home between 8 and 9 o'clock on the Saturday morning in question, and that about 30 minutes later Harris walked by, traveling toward the main highway. Of the persons who saw Brown returning from the direction of Sears' residence, some testified that they heard a shotgun blast in the direction of the Sears' residence in the interval between the time Brown drove toward Sears' residence and the time he returned. Others testified they did not hear such an explosion. A number of other persons who lived in the vicinity testified that they heard a single shotgun blast about 10 o'clock that morning in the direction of Sears' residence.

About one o'clock on the same day, Brown drove back to Sears' home with his wife and two children. At that time the body of Sears was found lying in a path leading from his home to a spring a short distance away. He had been shot in the back of the head at close range with a shotgun. The shot charge entered the left side of the back of his head, some of it coming out around his right eye. Parts of his brain and flesh had been blown out and were scattered on the ground and bushes at the scene. The trees and bushes in the area were not dense enough to afford cover for an ambush. There were no other bruises or injuries on the body of Sears, and there was no indication of a struggle. No weapon or accessories were found on or near the scene.

A 12-gauge shotgun and a box of old shotgun shells were taken from the home of the father of Amos Brown by the investigating officers. One of these shells, plus wadding and shot pellets removed from the head of Sears, were sent to the FBI laboratory in Washington for examination and tests, which were made. The FBI ballistics expert testified that the wadding taken from Sears' head was fired from a 12-gauge shotgun shell and that the shotgun pellets taken from Sears' head were probably No. 5 shot. The wadding taken from Sears' head did not compare in composition with that taken from the loaded shotgun shell which was found in the home of Brown's father. However, he testified no significance could be attached to this fact due to the method of manufacturing such wadding. The loaded shell also contained No. 5 shot.

The sheriff and county judge of Logan County, together with others who heard some of the conversation, testified that when first questioned about the incident Brown denied being at Sears' home on the morning in question. Later, he admitted being there. Also, following Brown's arrest on Saturday night, in fact Monday morning following, he denied having any shotgun when he went

to the Sears' home on Saturday morning. Three days later he admitted that he did have the shotgun with him in his car.

Brown testified that he went to the home of Sears that Saturday morning to procure some parts for his car; that Harris was there at the time, and that the three of them engaged in conversation for 30 or 45 minutes; that Sears and Harris helped him start his car by giving it a push; that he offered Harris a ride but that Harris refused it because he was tired of pushing Brown's car; that he then left and drove home; that while eating the midday meal one of his boys told him he needed a pair of shoes and since he did not have any money, he, with his wife and two sons, drove to the Sears' home to borrow the money from Sears with which he might purchase the shoes. It was at this time that Sears was found dead by the two sons of Brown.

Brown admitted on the trial that when he made the first trip to the Sears' home on the morning in question he had a 12-gauge shotgun in the car with him. He claimed, however, he had an engagement to go squirrel hunting with a neighbor who could not go because of sickness, and that was the reason he had the gun. Brown stated that he had no shells for the shotgun with him because the neighbor was to furnish them. Brown's parents testified that the shotgun was taken from their home and returned without their knowledge. Brown admitted that this was true.

As if to show a possible motive for the killing, the Commonwealth established that Brown's wife was the only heir of Sears, and that Brown was indebted to him in the amount of $50 and possibly needed more money. But the evidence shows that Brown was permitted to take from the home of Sears after he was killed a trunk that contained some $220 and certain valuable papers. However, when the trunk was examined by the sheriff a few days later the contents had not been disturbed. At the time he was killed Sears had approximately $22 on his person and it had not been disturbed.

The rule obtains in this state that where there is any evidence of a probative character, whether direct or circumstantial, tending to establish guilt, the jury should determine its weight as bearing on the guilt or innocence of the accused. Utterback v. Commonwealth, 190 Ky. 138, 226 S.W. 1065; Nelson v. Commonwealth, 232 Ky. 568, 24 S.W.2d 276. Conversely, where the evidence might tend to create a suspicion of guilt and there is no incriminating evidence upon which to base a verdict, the trial court should direct a verdict of acquittal.

A careful consideration of all the evidence in this case and the legitimate inferences to be drawn therefrom convinces us that the evidence of guilt went beyond mere suspicion and is consistent with his guilt and inconsistent with his innocence. Newton v. Commonwealth, 222 Ky. 817, 2 S.W.2d 661; Pennington v. Commonwealth, Ky., 262 S.W.2d 689.

We believe the question of the guilt or innocence of appellant was for the jury to decide, entirely circumstantial though the evidence was.

Appellant contends that competent evidence was excluded by the court. His attorney, in his cross-examination of Robert Zimmers, a special agent in the FBI firearms laboratory in Washington, concerning his examination of the shotgun shell, wadding, and shot pellets, asked the following questions, to which objections were sustained:

"Q. 158 And you state to this Jury that you yourself would not rely upon this type of evidence for a conviction?

"Q. 160 I mean as an expert can you determine yourself, and is it considered by the F. B. I. * * *

"Q. 161 Do you believe that this evidence is sufficient, of sufficient credibility * * *

"Q. 162 Would you rely on it?

"Q. 163 Would you rely on it as competent and credible evidence?"

■ Evidence that might have been adduced from such questions would have required Mr. Zimmers to evaluate his own testimony. The weight or significance to be attached to his testimony was for the jury to determine. Obviously, that line of testimony was properly kept out of the trial.

■ Appellant next argues that the court admitted much incompetent evidence over his objections. The first objection relates to the testimony of Mr. Zimmers concerning the difference in composition of the wadding taken from the head of Sears and that taken from the loaded shell. He contends that this testimony should have been excluded because it was in no way connected with Brown, and because the integrity of the exhibits was not established. However, there was positive testimony by the coroner, state policemen and the FBI agent which established beyond doubt the integrity of the exhibits. With respect to the difference in the wadding, the agent was testifying only as to the results of his examination. While it proved hardly anything, we think it was competent. Even if it was incompetent, its admission could not have been prejudicial to Brown, since it would tend to show, if anything, that the shell used in killing Sears was not taken from the box found in the home of Brown's father.

Appellant vigorously protests that certain evidence was permitted to go to the jury concerning statements Brown had made previous to the trial, and he insists that such statements and evidence elicited ran afoul of the anti-sweating statute, KRS 422.110.

Before his arrest Brown was summoned to testify before the coroner's jury, and after his arrest he was taken before the county judge for questioning on three different occasions. The sheriff, county judge, county attorney, and a deputy sheriff, who were all present, testified that when first questioned Brown denied being at the Sears' residence the morning of the day he was killed. It will be remembered that he later admitted being there. He also stated that he did not have a shotgun with him when he went to the Sears' home. He later admitted that he did have the gun. Brown contends that this testimony was incompetent because he was being questioned involuntarily at the inquest and also while under arrest, without the benefit of counsel, without being advised of his constitutional rights, and because he was plied with questions in an attempt to extort information from him. The county officials testified that Brown was not under duress; that he did not ask for counsel; that he was advised concerning his constitutional rights, and that the answers he made were voluntarily made. The evidence shows that he was questioned no more than 30 minutes on either occasion.

■■ We think his testimony at the coroner's inquest was admissible. The prevailing rule is that where it is not shown that there is any hope or fear held out by those connected with the prosecution, and a person not under arrest willingly testifies at the inquest, even though he is suspected, and not cautioned, such evidence should be considered voluntary and is admissible at his trial. Hill v. Commonwealth, 232 Ky. 453, 23 S.W.2d 930; Pruett v. Commonwealth, 199 Ky. 35, 250 S.W. 131.

■ With respect to Brown's statements when being questioned before the county judge, we have held that contradictory statements made by an accused person previous to his trial are admissible in evidence because they become a relevant circumstance showing consciousness of guilt. Couch v. Commonwealth, 255 Ky. 729, 75 S.W.2d 360. Section 422.110, KRS, prohibits a confession given involuntarily from being introduced in evidence against the accused. The purpose of the statute is to exclude confessions or statements obtained by wrongful means. A confession made without threats, duress or other circumstances rendering it involuntary, is admissible against the person, although it is made after the arrest. The " 'plying with questions' " forbidden by the statute means " * * * 'the persistent and repeated propounding of inquiries to elicit a desired answer, carried to such an extent that the

prisoner feels required to answer as the questioner wishes in order to escape from the pressure.'" Curtis v. Commonwealth, 312 Ky. 205, 226 S.W.2d 753, 754. There is no showing that Brown was questioned to this extent by the officers, and his statements made before them were admissible in evidence.

■ The Commonwealth's attorney, over objection, was permitted by the court to cross-examine Brown concerning his activities the night before Sears was killed. In the course of such examination it was brought out that Brown had been to a place called Cedar Dale that night with a woman other than his wife. Mrs. Brown was also cross-examined concerning her knowledge of Brown's activities on the night in question, and he elicited from her an admission that she knew Brown had been seen in the company of a woman at Cedar Dale. Reference to this evidence was made by the Commonwealth's attorney in his closing argument to the jury.

The Commonwealth argues that this evidence was admissible for the purpose of showing motive in that Brown had spent all his money entertaining his companion the night before the homicide and then killed Sears to get money. However, this contention seems too speculative. There is no indication that the motive back of the killing was to obtain money. On the contrary, it was shown that the money Sears had on his person was not taken, and the money in the trunk which had been taken by Brown had not been disturbed.

The evidence of Brown's unfaithfulness to his wife, and the evidence elicited from Brown and his wife in that regard, related to a collateral matter which had no proper place in this prosecution. It appears to us that the evidence tended to smear Brown's character by inferences and insinuations. Since Brown was a married man, this line of evidence might have induced the jury to believe Brown was gallivanting around, and a carouser by night. This evidence was not only incompetent, but was highly prejudicial and constituted reversible error. See Acres v. Commonwealth, Ky., 259 S.W.2d 38. Especially do we believe this evidence should have been kept out of this case, a close one on the facts. Coleman v. Commonwealth, 204 Ky. 652, 265 S.W. 1.

■ The instructions given by the trial court embraced wilful murder and reasonable doubt. It is contended by Brown that the court should have instructed on manslaughter and self-defense. With this contention we do not agree. We have adopted the rule that where the evidence is wholly circumstantial and the facts lead inescapably to the conclusion that the crime, whoever committed it, was murder, there being no evidence of a struggle or other unusual circumstances from which the jury might infer a lesser degree of the crime, the accused is not entitled either to a manslaughter or self-defense instruction. Marcum v. Commonwealth, 305 Ky. 92, 202 S.W.2d 1012; Thorpe v. Commonwealth, 301 Ky. 541, 191 S.W.2d 572; Combs v. Commonwealth, 292 Ky. 1, 165 S.W.2d 832. In the case before us it is apparent that whoever committed this heinous crime was guilty of murder. Sears was shot in the back of the head, there were no other bruises or marks on his body, there was no evidence of a struggle, and there was no claim of self-defense. The court properly instructed the jury.

Since we are reversing the judgment due to the court's error in admitting prejudicially incompetent evidence relating to Brown's activities the night before the homicide, the question concerning the treatment of the jury while the case was under submission need not be dealt with in this opinion because it will not likely happen again. It also follows that the argument of the Commonwealth's attorney concerning Brown's activities with the woman the night before was not proper.

Judgment reversed for proceedings consistent with this opinion.