Donald Ray CARSON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

June 19, 1964.

As Modified on Denial of Rehearing Oct. 2, 1964.

Joseph R. Huddleston, Bowling Green,. for appellant.

John B. Breckinridge, Atty. Gen., Geo. F. Rabe, Asst. Atty. Gen., Frankfort, Morris Lowe, Commonwealth Atty., Bowling Green, for appellee.

DAVIS, Commissioner.

Donald Ray Carson was found guilty of the willful murder of Bobby Young upon a jury trial in the Warren Circuit Court. The jury's verdict fixed his punishment at death.

On this appeal Carson presents these grounds for reversal of the conviction: (1) Permitting the prosecution to excuse for cause those prospective jurors who expressed conscientious scruples against imposition of the death penalty; (2) admis-

sion of a photograph of the appellant; (3) admission of a photograph of the victim; (4) admission of a written statement given by appellant before he was taken before a magistrate and while he was without legal counsel; (5) admission of oral statements made by appellant to the victim's father, made while appellant had no legal counsel; (6) failure of the examining court to provide an attorney for the accused; (7) placing the jury in custody of the sheriff, since the latter was a prosecution witness; and (8) erroneous instruction concerning necessity for unanimity of the verdict.

The slaying of Bobby Young occurred September 5, 1962. Two days earlier appellant and a sixteen-year-old companion, William Boyd, both negroes, entered upon a joint course of conduct, interspersed with automobile theft, housebreaking, larceny and ultimately the murder of Bobby Young. The record is silent as to the age, experience and educational background of appellant. It is apparent from the record that appellant is older than William Boyd.

Appellant and Boyd (who was jointly indicted with appellant) stole a car in Bowling Green on the night before the homicide. They drove the stolen car into the western rural section of Warren County, near the scene of the killing. In fact, the car broke down in the gate of the Young farm (a farm owned by the victim's father and managed by the victim). Appellant and Boyd temporarily abandoned the car that night and took shelter in a vacant residence in the neighborhood. On the morning of the instant crime the pair broke into a country house owned by Hon. Robert M. Coleman, presently judge of Warren Circuit Court. (Judge Coleman was not presiding at the trial of this case, however.)

Boyd and appellant stole several articles of clothing from Judge Coleman's premises and made themselves completely at home by participating of food found there. In addition to the food and clothing they took Judge Coleman's bolt action, single shot .22 caliber Mossberg rifle. Miscel-

laneous other articles were identified by Judge Coleman as having been taken from his house. Among articles recovered from the stolen car after appellant and Boyd abandoned it were crudely made masks.

The comrades in crime repaired and recovered the disabled stolen car from its situs near the Young farm. They remained in Judge Coleman's property until about 4:00 or 4:30 p. m., at which time they departed, doubtless emboldened by being armed with the rifle, freshly stolen clothes, adequate food and some wine. They returned to the Young farm, where they had previously observed a tractor stored in a shed. Appellant and Boyd were engaged in siphoning gasoline from the tractor when they were interrupted by the arrival of Bobby Young and Harry Watkins.

Young and Watkins were traveling in a car driven by Young when the latter observed an open gate leading into the Young farm. Young drove in the gate to investigate. A second open gate was observed; Young and Watkins passed through the second gate to a point about four feet from the shed in which the tractor was stored. The tractor was sitting in the shed, and the stolen car was on the "other side" of it, backed up against it. Watkins related that he saw nobody about the tractor when he and Young arrived.

When appellant and Boyd observed the approach of Young and Watkins they left off their gasoline stealing project and took cover—Boyd fled "to the left" and hid in some weeds; appellant, according to Boyd's testimony, went "to his right" toward the barn. Other evidence indicates that appellant had hidden in a barn close by. Whether Boyd or appellant then had possession of the stolen rifle is a point sharply disputed as between Boyd and appellant. However that may be, there is abundant evidence warranting the conclusion that appellant then had the rifle—

the jury accepted that version, as it clearly had the right to do.

Young alighted from his car, as did Watkins. Young proceeded into the shed and got on the tractor, between the gas tank and seat. Watkins was standing about twenty feet from the shed. Without warning, Watkins was shot. He said the shot sounded as if it came from a rifle fired from the nearby barn. The bullet struck Watkins at a point just above his heart. Watkins then ran into the shed where Young was still on the tractor. Two more shots were heard; one of the shots wounded Young.

Watkins then came from the end of the shed and climbed a fence into a field of high weeds. He went along a trail in the weeds approximately 75 or 100 feet, whereupon he turned back toward the shed. He then observed a negro man, attired in a white shirt, brandishing a rifle above the weeds. (Later Watkins identified appellant as the man he saw with the rifle.) Watkins saw the man with the rifle climb back over the fence and go into the shed. Watkins heard two more shots. He did not see either of them fired, nor did he see Bobby Young alive again. Watkins said that it appeared to him that Young's car had been moved to a position about 75 feet from the shed when the last shot heard by him was fired.

Boyd recounted that he had gone over the fence into the same field to which Watkins fled, and that Watkins had walked past Boyd as he went toward the Barren River. The same witness also said that Young too had gotten over into the same field, and that he, Boyd, "stood up and asked him what had happened and Bobby told me that he had been shot." According to Boyd, Watkins called out to Young, directing him to get into the car as he, Watkins, had been shot.

Boyd said that as Young was getting in the car two more shots were fired, at which point he observed appellant standing by the driver's side of the car, demanding that Young get out of the car. Bobby Young asked appellant not to kill him, as he had already been shot; but appellant shot Young again. Then appellant fired a shot into a front tire of the Young car. Thereupon, appellant and Boyd departed the scene in the stolen car, which was later found wrecked and abandoned.

It was shown that two bullet holes were found in the back portion of the front seat of the Young car just after the incident. They ranged in a downward course. The tire on the left front wheel of the car also had been shot and was flat.

Bobby Young was found alongside the road leading from the Young farm back toward the river. He was living, but fatally wounded. Appellant's counsel elicited from a witness who found the victim that the latter had said he had been shot by two young negroes, but he had not identified either of them. Bobby Young died shortly after admission to the hospital at Bowling Green. Three bullet wounds, all reflecting a downward course of the bullets, were found in his body.

Appellant and Boyd were apprehended the next day after the shooting. At the time of their capture Boyd had the rifle in his possession. Boyd undertook to explain his possession of the rifle on the theory that appellant had threatened to kill anyone who attempted to stop them. According to Boyd, he took the rifle to avert further bloodletting.

The two fugitives were taken to the Kentucky State Police barracks about one mile south of Bowling Green. There they were fingerprinted and photographed. At that time each of them signed a statement, the details and circumstances of which will be later discussed in this opinion. The chief variance in the statements of the two men lies in the fact that each claimed that the other had done the actual shooting of Bobby Young.

One of the officers who took the statements estimated that no more that one hour elapsed in the process. There was no evidence that either of the men was threatened or otherwise mistreated on the occasion. The same officer testified that he telephoned to the county judge's office just after obtaining the statements, but upon learning that the judge was not then available, lodged the two men in the county jail to await disposition of them by the judge. Although the record of proceedings before the county judge is not set forth, it is shown that appellant waived examining trial when brought before the county judge.

An indictment was returned on September 11, 1962, just six days after the shooting occurred. The circuit court appointed counsel for appellant, and upon motion of that counsel, granted a continuance of the case until the January, 1963, term of the court; the instant trial was held during the January, 1963, term.

■ There was no error in permitting the prosecution to excuse for cause those prospective jurors who expressed conscientious scruples against imposition of a death sentence. Counsel for appellant concedes that our cases resolve the contention adversely to his present position. However, it is correctly observed that the decisions deal with the law extant under former Criminal Code, § 210(7). That Criminal Code provision specifically made such scruples ground for challenge for cause. Tarrence v. Commonwealth, Ky., 265 S.W.2d 40. The present case was tried after the effective date of the new rules of criminal procedure. RCr 9.36(1) has superseded § 210 of the Criminal Code of Practice. By its terms, RCr 9.36(1) omits any detailed list of challenges for cause, but authorizes "cause" challenges in this language:

"* * * When there is reasonable ground to believe that a juror cannot render a fair and impartial verdict on the evidence, he shall be excused as disqualified to serve." RCr 9.36(1).

It is our view that a prospective juror's unqualified opposition to capital punishment, regardless of the degree of proof, is valid ground for challenge for cause in a case wherein capital punishment is within the scope of permitted punishment. This is the view accepted by virtually all jurisdictions and is one that has basis in sound reason. See 48 A.L.R.2d 560, et seq.; 50 C.J.S. Juries § 275e; 31 Am. Jur., Jury, §§ 186, 187.

■ During the trial the prosecution introduced in evidence a photograph taken shortly after the apprehension of appellant and Boyd. It depicts two State troopers and the two accused men. Appellant suggests two bases of error in this respect. He insists that the picture casts him in a pose calculated to be prejudicial to him since it reflects a smile on appellant's countenance. Appellant insists that the picture unfairly shows him as a haughty and disdainful person.

Secondly, appellant argues that the same photograph had appeared in highly inflammatory newspaper accounts of the murder. It is reasoned that this served to recall to the minds of the jurors all that had appeared in the press about the crime.

For the Commonwealth it is said that the purpose of the photograph was to point up the fact that appellant was clad in a white shirt—thus affording corroboration to the evidence of Boyd, the accomplice, and to the evidence of Watkins. We have examined the photograph. In our judgment there was no error in its admission. This is particularly so in light of the fact that no showing is made that the prosecution sought to argue to the jury that the picture demonstrated appellant's character as haughty or disdainful. Moreover, the appellant was present before the jury throughout the trial; it may not be supposed that the jury attributed any unusual significance to the picture. It is signifi-

cant that the same picture shows the officers smiling too.

■ As to the reference that the picture had appeared in news accounts, we need say only that there was no showing of the content of any such account. The jurors stated on their *voir dire* that they had read of the incident, but that they could and would dispel from their minds all they had read or heard. There is no showing that any juror failed to obey his oath. It is well-settled that photographs are admissible in criminal cases, usually on the same basis as in civil actions. Even though the admission of a photograph may arouse passion, or bring to mind vividly the details of a shocking crime, if the picture serves to illustrate a material fact or condition, it is considered admissible. 20 Am. Jur., Evidence, §§ 727, 728; 159 A.L.R. 1413, et seq.; 2 Wharton's Criminal Evidence, § 686.

■ What has just been said as to the admission of the photograph of the appellant is likewise applicable as to the introduction of the picture of the victim, Bobby Young. It is conceded by the Attorney General in brief that our cases recognize the principle that such photographs of a victim should not be received in evidence unless some useful purpose is served thereby. However, in the absence of a showing of prejudice, admission of photographs of a victim has not been deemed reversible error. Milam v. Commonwealth, Ky., 275 S.W.2d 921; Cox v. Commonwealth, 215 Ky. 585, 286 S.W. 689; Alder v. Commonwealth, 215 Ky. 613, 286 S.W. 696; Coffey v. Commonwealth, Ky., 256 S.W.2d 379.

Appellant gave a written confession to the officers shortly after his apprehension. It is urged that the written confession should have been excluded from evidence, first, because the appellant was not taken forthwith before a magistrate, and secondly, because the appellant had no counsel when the statement was obtained. We shall discuss these contentions separately.

For the Commonwealth, without contradiction by or for the appellant, it was shown that the appellant and Boyd were advised of their right to have counsel, that neither of them was required to make any statement, and that any statement made could be used against them in prosecutive action. There is neither proof nor contention that any threat or promise was used in obtaining the statement. In short, the record affirmatively shows the statement was given freely and voluntarily; there is no hint of anything to the contrary.

It is to be observed that the statement given by appellant confesses appellant's shooting of Watkins—but asserts that appellant dropped the rifle, which was picked up by Boyd, who proceeded to shoot and kill Bobby Young. Boyd's statement, taken at the same time and under the same circumstances, is generally the same as appellant's, with the pivotal exception of Boyd's assertion that appellant did *all* of the shooting.

■■ We adhere to the settled rule that the admissibility of an accused's statement under circumstances similar to those at bar must be tested upon the facts presented. The trial court's ruling, resting on an issue of fact, will not be disturbed unless it satisfactorily appears there was insufficient evidence to support such ruling. Smith v. Commonwealth, Ky., 366 S.W.2d 902; Tarrence v. Commonwealth, Ky., 265 S.W.2d 52, cert. den. 348 U.S. 899, 75 S.Ct. 220, 99 L.Ed. 706, and cases there cited. Here there was *no* evidence that the appellant's statement was coerced, or that it was made involuntarily.

■ The fact that appellant was not "forthwith carried before the most convenient magistrate of the county" as prescribed by then applicable § 46 of the Criminal Code of Practice does not *ipso facto* vitiate the statement. We have consistently held that an accused's statements made under such circumstances are properly admitted, unless it is shown that delay in pre-

senting him before a magistrate served as an unlawful means in coercing a statement. Brown v. Commonwealth, Ky., 275 S.W.2d 928; Reed v. Commonwealth, 312 Ky. 214, 226 S.W.2d 513; Commonwealth v. Mayhew, 297 Ky. 172, 178 S.W.2d 928.

In the annotation in 1 L.Ed.2d 1735, it is said:

"A confession is not, as a matter of due process, inadmissible merely because of an undue delay, prior to the making of the confession, on the part of the police in taking the accused before a committing magistrate. However, such delay is one of the factors to be considered in determining whether a confession, permitted to be introduced and relied upon at a state trial, has been obtained under such circumstances that its use violates due process." 1 L.Ed.2d, pp. 1747–1748.

The United States Supreme Court has adhered to the principle that failure to carry an accused forthwith before a magistrate does not, standing alone, invalidate a confession obtained in the interim. Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522; Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246. See supplemental annotation at 4 L.Ed.2d 1833, et seq., wherein are collected and discussed Supreme Court decisions subsequent to the annotation in 1 L.Ed.2d 1735.

█ Whether appellant's statement should have been excluded because taken when he was without an attorney presents a related question to that just discussed. The point was decided adversely to appellant's contention and fully discussed in Bauer v. Commonwealth, Ky., 364 S.W.2d 655, and Goff v. Commonwealth, Ky., 245 S.W.2d 446. In the instant case it is said without contradiction that appellant was fully informed that he could obtain counsel before making any statement; there is no showing that he requested counsel.

In Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448, it appeared the defendant had asked state authorities for opportunity to obtain counsel, but his request was refused. He made a statement, without counsel. The United States Supreme Court ruled that the statement was properly admitted in evidence in the absence of any showing of coercion or prejudice. In writing for the majority, Mr. Justice Clark observed:

"He would have every state denial of a request to contact counsel be an infringement of the constitutional right *without regard to the circumstances of the case*. In the absence of any confession, plea or waiver—or other event prejudicial to the accused—such a doctrine would create a complete anomaly, since nothing would remain that could be corrected on a new trial. Refusal by state authorities of the request to contact counsel necessarily would then be an absolute bar to conviction. On the other hand, where an event has occurred while an accused was without his counsel which fairly promises to adversely affect his chances, the doctrine suggested by petitioner would have a lesser but still *devastating* effect on enforcement of criminal law, for it would effectively preclude police questioning —*fair as well as unfair*—until the accused was afforded opportunity to call his attorney." Op. cit. 357 U.S. at pp. 440–441, 78 S.Ct. at p. 1292, 2 L.Ed.2d at pp. 1454–1455.

We subscribe to the reasoning of the Supreme Court as expressed. If an accused may refuse opportunity to consult counsel and then claim denial of due process to foreclose admission of a statement voluntarily made, shrewd criminals will be quick to grasp the opportunity to confess without counsel, thus gaining complete acquittal without any trial. That this would present an anomaly is not to overstate the case.

We read Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037, as standing for the proposition that the United States Supreme Court will review the de-

cision of any state court relating to the admissibility of a confession obtained from an accused in custody, and before he is taken before a magistrate, to determine whether such confession has been obtained voluntarily. We do not interpret that decision as holding that all confessions so obtained are inadmissible, no matter what the circumstances. See 19 A.L.R.2d 1331, et seq.

It is our conclusion that there is a complete absence of any showing tending to impugn the voluntary nature of the confession in this case. Accordingly, we find no merit in appellant's contentions concerning the confession.

■ Shortly after the date of the crime, before the indictment, and while appellant was incarcerated in the Warren County jail, the father of the victim went into appellant's cell and talked with him. The substance of their very brief conversation was admitted in evidence over appellant's objection. Appellant attacks this admission of evidence as violative of Kentucky's "Anti-Sweating Statute" (KRS 422.110) and as a denial of appellant's constitutional right to be represented by counsel at every critical stage of the proceeding.

The testimony along this line is thus recorded:

"Q. 11: What did you say to him?"

"A: I said: 'Donald, why did you kill Bobby?' And he said: 'Well, it is just this way, there was two of them.' And I said, ' * * * well, there was two of you all and you all had a gun.' And another thing I said: 'Where did you shoot him from?' And he said: 'The first shot was out of the barn where you milked.' "

It is not claimed that the victim's father used any force or in any other way intimidated appellant. The point is made that inasmuch as appellant was then in jail, charged with a capital offense, he was at such disadvantage as to make coercion implicit. The trial judge carefully considered

the preliminary question whether appellant's statements to the elder Young were voluntary and free of coercion. He resolved that question adversely to appellant. Under such circumstances, and in the total absence of any contrary showing, we conclude that there was no error in the admission of appellant's statements to the victim's father. Bauer v. Com., Ky., 364 S.W.2d 655, and cases discussed therein. The same principles applicable to the admissibility of the written statement, discussed earlier in this opinion, apply to the question under consideration.

Our attention has been directed to Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. In our view Massiah has at least four significant distinctions from the case at bar:

The prosecution there was in the federal court system where the specific guarantees of the Sixth Amendment directly apply.

Massiah had been indicted and had counsel; he was at liberty on bail. These facts were known to the federal agents.

The incriminating admissions were procured pursuant to a deliberate surreptitious subterfuge conceived and executed by the prosecuting federal agents.

Massiah was unaware that he was being interrogated. He had no idea that what he was saying was being overheard by federal agents.

In the case before us the appellant had not been indicted when his interview with Mr. Young took place. At that time, so far as is shown by the record, he had no attorney. Prior to the interview he had already made a written statement, as had his confederate. Appellant knew of the statement of his accomplice, since it had been read to him. Appellant knew that he was talking to the victim's father—they were not strangers. There is no suggestion that the interview was the result of a scheme or device concocted by prosecuting officials, or anyone else. No pres-

sure or coercion appears. In short, we believe the factual situation in Massiah readily demonstrates that its rationale does not rule the instant decision.

In 90 A.L.R.2d 732 appears an annotation dealing with the admission of a confession or incriminatory statement made after indictment and in absence of counsel. The annotation was published prior to the ruling in Massiah. (The case is discussed on the basis of the ruling of the 2nd Circuit Court of Appeals, which was reversed by the Supreme Court. United States v. Massiah, (1962 CA2 N.Y.) 307 F.2d 62.) It is noted in the cited annotation that the question first arose in 1958. Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. In the majority opinion in Spano, Mr. Chief Justice Warren wrote for the court that it was not necessary to reach the question whether any confession taken after indictment, without presence of counsel, *ipso facto* is violative of due process. In separate opinions other justices expressed the view that absence of counsel, of itself, was violative of constitutional due process. So far as we have found, no decision of the Supreme Court has held such confession void where taken *before* indictment or arraignment, solely on the basis of absence of legal counsel. We are of the view that the more reasonable and safer position is to examine the circumstances surrounding any confession, whenever made, so that its admissibility may be weighed in light of whether it was in fact truly voluntary. In our judgment it is unrealistic to hold, as a rule of thumb, that any confession is absolutely void *solely* on the basis of absence of legal counsel when made. Neither do we feel that the rule should be different whether the confession occurred before or after indictment. For these reasons, we conclude that the statements appellant made to Mr. Young were properly admitted.

Appellant insists that White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193, and Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114, conclusively

determine that his constitutional right to due process was denied because he did not have counsel when brought before the Warren County Judge for examining trial. First blush reading of those decisions tends to support that view, but more considerate analysis of them shows they do not rule this case.

In White the accused entered a guilty plea at his preliminary hearing. The trial court permitted evidence of that guilty plea upon the jury trial. In Hamilton it appeared that *only* at the examining trial could certain defenses be raised. It is true that in each of the cited opinions the Supreme Court wrote that *prejudice* is not the determinative question. However, in each of those cases definite prejudice to the accused was shown. The basis for both decisions appears to us to be that the particular preliminary hearings were considered to be "critical stages" in the criminal proceeding. The Supreme Court rule, by which all federal and state courts are bound, is that due process requires that an accused have counsel at any critical stage of the criminal proceeding, unless that right is competently waived. If it is found that opportunity for counsel has not been afforded at a critical stage, the matter of prejudice is not involved. The determinative factor is whether the particular activity is at a critical stage.

The present record is nearly devoid of any showing as to the examining trial procedure. In fact, all of the evidence as to the examining trial is embodied in three questions and answers, as follows:

"Q. 74. Were you present at the ex-examining trial?

"A. Yes, sir.

"Q. 75. Was he given an examining trial?

"A. He waived to the magistrate.

"Q. 76. Was he advised at that time that he had a right to engage

an attorney by the County Judge?

"A. I don't recall, Mr. Huddleston, whether he was or not."

We are told in appellant's brief that no counsel was furnished by the examining magistrate (Warren County Judge). Upon an oral argument before us appellant's counsel asserted that as fact. For purposes of discussion we accept the statement as accurate, although we entertain doubt that the question is properly preserved.

The general framework for examining trials in Kentucky was embraced in §§ 49 through 71a–8 of the Criminal Code of Practice. The examining trial procedures are now contained in RCr 3.02 through 3.22, as supplemented by certain statutory provisions; the former Criminal Code provisions were applicable at the time appellant was before the Warren County Judge. Criminal Code § 51 provided that before commencing the examination the magistrate shall state the charge, and inquire of the defendant whether he desires the aid of counsel, and shall allow a reasonable opportunity for procuring it. No provision of the Criminal Code required the examining magistrate to appoint counsel at the examining trial.

This jurisdiction has long held fast the fundamental right of an accused to be represented by counsel. Kentucky Constitution § 11 specifically provides that an accused has the right to be heard by himself and counsel in all criminal prosecutions. This court has repeatedly held that the accused's right to counsel is an inviolable one, and may be waived only if done understandingly, intelligently, competently and voluntarily. Schneider v. Com., Ky., 332 S.W.2d 250; Roberts v. Com., Ky., 339 S.W.2d 640; Hart v. Com., Ky., 296 S.W.2d 212; 6 Ky.Digest 2, Criminal Law, ⚖=641.

However, so far as our research has disclosed, we have no case which assures the right to appointment of counsel at an examining trial. It is noteworthy that in the newly adopted Rules of Criminal Procedure, by RCr 8.04 the matter of assignment of counsel is made necessary "If on arraignment or thereafter, in felony cases, the defendant appears in court without counsel * * *." By RCr 8.02 arraignment includes the reading of the indictment. Arraignment was defined by Criminal Code, § 154, as " * * * the reading of the indictment by the clerk to the defendant, and asking him if he pleads guilty, or not guilty, to the indictment." It is clear that an arraignment may not occur until an indictment or information has issued. Neither of these can be issued by the examining magistrate.

If the magistrate concludes from the examination that reasonable grounds exist to believe the defendant guilty of the offense charged, he shall be held for trial and committed to jail, or discharged on bail. Criminal Code, § 66. Conversely, Criminal Code, § 65, provided that should the magistrate be of the opinion that the examination failed to reveal sufficient cause for believing that the defendant had committed a public offense, he was to discharge the defendant from custody. The magistrate had no jurisdiction to try the charged felony on its merits, nor could any plea of the defendant's guilt be accepted; such a "plea" could be interpreted only as a waiver of examining trial.

We envision a situation wherein an examining magistrate arbitrarily refuses to permit the defendant to have counsel; then the magistrate discharges the accused from custody upon a finding that no probable cause to hold him had been shown. Thereafter a grand jury returns an indictment accusing the defendant of the crime. Would the failure of the magistrate to furnish counsel at the examining trial preclude prosecution of the defendant? We cannot perceive that it would. By parity of reasoning, it is our conclusion that the alleged failure to furnish counsel to the

present appellant at the preliminary hearing is not available as error here. It is our view that the examining trial is not such a critical stage of the proceeding as brings it within the purview of Hamilton v. Alabama, supra, or White v. Maryland, supra. Unless it is shown that something prejudicial to the defendant occurred by reason of his lack of counsel at that stage, there has been no infringement of his fundamental rights.

■ Appellant asserts that it was reversible error to place the jury in the custody of the sheriff, since the sheriff was a witness for the prosecution. The record reflects that the sheriff was a witness for the prosecution to the extent that he introduced into evidence a sealed envelope containing a bullet which had been delivered to him by a State trooper. The appellant does not charge that the sheriff made any overture toward influencing any member of the jury, but rests his claim on the theory that since the sheriff was gracious to the jury during the periods of court recess, the jury would likely feel inclined to favor the sheriff's "side" of the case. Actually, there was no effort to attack the integrity of the bullet. Neither did the bullet have a significant part in the case, since no ballistic test was made. We conclude the asserted error is without merit.

■ Finally, the appellant charges error in failure of the trial court to specifically instruct the jury that its finding as to *penalty* required unanimity. There were five separate instructions given. The first one defined willful murder and advised the jury of the optional penalties of life imprisonment or death. It was in the usual and approved form. The second instruction informed the jury that even if it should believe beyond reasonable doubt that an out of court confession by appellant amounted to a confession of guilt, such confession may not support conviction unless accompanied by other proof that such an offense was committed. By the third instruction the jury was told that if it believed Wil-

liam Boyd was an accomplice, it could not convict upon Boyd's testimony unless the testimony was corroborated by other evidence tending to connect appellant with the offense; the instruction was in usual form, and is not challenged. The fourth instruction was the usual reasonable doubt admonition. The fifth one required that the verdict be unanimous, and is as follows: "The verdict of the jury must be unanimous and signed by one of your number as foreman."

■ It is fundamental that the instructions are to be considered as a series and in their entirety. Jackson v. Com., 285 Ky. 313, 147 S.W.2d 715; Stanley's Instructions to Juries, § 800. There could be no doubt that the jury fully understood that its entire verdict must be unanimous, because its finding could not be called a "verdict" unless it encompassed both the issue of guilt and the degree of punishment. Upon a unanimous decision of "not guilty" the degree of punishment would have become moot. It is significant that in its verdict the jury incorporated this sentence: "This decision is unanimous." We are unable to find error in this regard.

■ Consistent with our well-known policy, we have carefully examined every question presented in this record. We have bypassed the technical failure of appellant to timely file the record as required by RCr 12.58. Smith v. Com., Ky., 366 S.W.2d 902; Bowman v. Com., Ky., 290 S.W.2d 814.

In his petition for rehearing appellant urges that Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, requires reversal of the case at bar. The basis of *Escobedo* is stated in the majority opinion of Mr. Justice Goldberg:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out

a process of interrogations that lends itself to eliciting incriminating statements, the suspect *has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent,* the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S., at 342, 83 S.Ct., at 795 [9 L.Ed.2d at 804, 93 A.L.R.2d 733], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (Emphasis added.) Op. cit. 378 U.S. 490, 84 S.Ct. 1765, 12 L.Ed.2d 986.

Here it is to be recalled that appellant was affirmatively advised of his right to counsel and his right to remain silent; he was cautioned that any given statement could be used against him in subsequent prosecution. We have no evidence of appellant's request for counsel; neither is there evidence that counsel was refused. On the other hand, there is affirmative undisputed evidence that appellant did not request counsel. We consider these basic factual differences as clearly distinguishing the present case from *Escobedo*.

It is our view of the case at bar that appellant has been accorded that degree of fundamental fairness essential to the concept of justice.

The judgment is affirmed.