David Eugene MATTHEWS, Appellant,

v.

**COMMONWEALTH of
Kentucky, Appellee.**

Supreme Court of Kentucky.

Sept. 26, 1985.

Rehearing Denied May 22, 1986.

Kathleen Kallaher, Randall L. Wheeler, Asst. Public Advocates, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., Virgil W. Webb, III, David A. Smith, Asst. Atty.

Gen., Frankfort, L.D. Simon, Sp. Asst. Atty. Gen., Louisville, for appellee.

LEIBSON, Justice.

David Eugene Matthews appeals from a judgment of the Jefferson Circuit Court sentencing him to the death penalty for the murder of his estranged wife, to the death penalty for the murder of his mother-in-law, and to twenty years' imprisonment for the first-degree burglary of his wife's residence.

Matthews and his wife, Marlene, had been married for about two and a half years before the murders. During the last year their marriage had undergone repeated periods of separation, during which Matthews lived with his mother. These separations were marked by extreme hostility, and Marlene often swore out criminal warrants against her husband for harassment.

In the five week period immediately before the murders occurred, Marlene had procured two separate warrants against Matthews. The first charged him with sexual abuse of his step-daughter, Marlene's six year old daughter. The second charged him with burglary by breaking into Marlene's residence. Matthews had been arrested on the first warrant and released under a court order forbidding him further contact with Marlene. He was not served with the burglary warrant until after the crimes at issue had occurred.

During the early morning hours of June 29, 1981, the victims were murdered in separate rooms at the home occupied by Marlene and her daughter. The house was rented from Marlene's family. Both victims were shot with a .22 caliber revolver fired from no more than eighteen inches away. Apparently Marlene died almost immediately. Marlene's father, Lawrence Cruse, came over the next morning and discovered her mother still alive, but mortally wounded. She had been shot in the head. He also found his daughter who had been shot twice, once in the chest and once in the back. Cruse found the side door

screen had been cut and the glass broken, and a pocketknife on the steps.

Appellant did not testify at trial. The evidence that he had broken into the house and that he was responsible for the shootings, however, was both overwhelming and uncontradicted. Defense counsel conceded from the outset of the trial that the appellant killed the two victims. His defense consisted of presenting evidence that he was acting under the influence of extreme emotional disturbance at the time, so that it was manslaughter, not murder.

To establish extreme emotional disturbance, appellant relied on the combined effect of testimony from a number of people about the long history of significant marital strife. Appellant also introduced testimony from a psychiatrist to show that, at the time of the homicides, he was suffering from an adjustment disorder, designated "a temporary emotional and behavioral disturbance" causing temporary impairment of judgment, poor self-control and diminished awareness.

In the account of the events on the night of the murder given by the appellant to the psychiatrist, the appellant said that he broke into his wife's home at about 1:00 or 2:00 a.m. He found his mother-in-law in bed and shot her. She was left mortally wounded. He then went into the next room, had sexual relations one or two times with his wife, stayed with her until about 6:00 a.m., and shot and killed her. He shot his wife twice because he thought he had missed the first time.

Appellant presents *thirty-seven* (37) separate assignments of error. We have considered all of these issues. In this opinion time and space dictate that we limit to the issues that merit discussion. As to those we do not discuss, we note, for the record, that they have been considered and rejected.

The assignments of error which we will discuss are appellant's claims that:

1) Evidence of the burglary warrant and the sexual abuse warrant taken out before

the murders occurred should not have been admitted.

2) The appellant's presentation of evidence of domestic conflict occurring before the murders took place was unduly limited.

3) Testimony admitted on cross examination of appellant's psychiatrist violated the psychiatrist/patient privilege.

4) The evidence did not sustain using the burglary charge as an aggravating factor justifying the death penalty.

5) The evidence did not sustain using multiple murder as an aggravating factor justifying the death penalty, and the jury's findings were insufficient on this point.

6) The use of the word "recommend" in the death penalty in the court's instructions was error.

7) The trial court failed to adequately instruct the jury when the jury inquired about parole.

8) The trial judge used improper and erroneous considerations in imposing sentence.

The appellant also presented us with the usual package of stock arguments related to statutory construction and administration of Kentucky's death penalty statute, subjects upon which we have already written at length and which need no repetition here.

For the reasons that follow we find no error justifying reversal of this case, and affirm.

## I. WARRANTS FOR BURGLARY AND SEXUAL ABUSE

■ The sexual abuse warrant had a direct bearing on the appellant's state of mind at the time that Marlene and her mother were killed. This kind of evidence is admissible to prove intent or state of mind. *Ringstaff v. Commonwealth*, Ky., 275 S.W.2d 946 (1955).

The appellant complains that before trial the trial judge advised that, when such evidence was to be admitted, the court would instruct the jury to the effect that it could be considered only as bearing on the accused's state of mind and not as proof of guilt of the offense charged. No such instruction was given, but since none was requested, we perceive no error in this respect.

■ It is quite evident that the warrant issued at the behest of Marlene, charging the appellant with sexual abuse of his stepdaughter, and the court order to stay away from Marlene's house which resulted from this warrant, in the time framework of this case, are relevant not only as evidence of motive or state of mind, but as part of the immediate circumstances bearing on the crimes charged. In *Francis v. Commonwealth*, Ky., 468 S.W.2d 287 (1971), we stated:

"While the prosecution is not privileged to show unconnected and isolated unlawful conduct that had no bearing whatsoever upon the crime under scrutiny, yet all the circumstances may be shown which have a relation to the particular violation of the law imputed, even if, in so doing, other offenses may be brought to light." *Id.* at 289.

■ Next, regarding the warrant charging the appellant with burglary of the same house on an occasion three days before the occurrence of the burglary and murders with which we are presently concerned, although there was no direct evidence that appellant was aware that this burglary warrant was outstanding, the circumstances that led to the warrant, and the warrant itself, reflected on a relevant pattern of conduct. It was part of the circumstances which evidenced the existing domestic difficulties between the appellant and his wife. As such, it bears a direct relation to the events of the tragedy and was admissible. *Dye v. Commonwealth*, Ky., 477 S.W.2d 805 (1972). Indeed, appellant was using the supposedly unjustified bringing of warrants to explain his emotional state.

Standing alone, the prior burglary warrant may have had little evidentiary value. But there was other evidence tying the appellant to this previous break-in, and there were striking similarities between the

vandalism on the previous occasion and the vandalism on the occasion of the burglary charged in the present indictment. There was no error in admitting the burglary warrant in the particular circumstances of this case. The general rule foreclosing evidence of other, unrelated crimes, does not apply. *Dye v. Commonwealth, supra.*

## II. WAS THE APPELLANT IMPROPERLY PREVENTED FROM INTRODUCING FURTHER EVIDENCE ABOUT PRIOR DOMESTIC CONFLICT?

■ Appellant claims that he was prevented from presenting certain evidence tending to further explain why he acted under extreme emotional disturbance. This claim of error runs to objections sustained as to certain details of the testimony from appellant's mother, from a longtime friend, and from a former attorney who had been involved in representing both the appellant and his wife when various domestic warrants between the two surfaced in court.

As stated in *Shumate v. Commonwealth,* Ky., 433 S.W.2d 340, (1968):

"The question of remoteness of evidence is one of degree, a relative concept with no fixed standard. What is or is not remote depends upon the facts of each case." *Id.* at 342.

In this case, the trial court permitted extensive presentation of evidence regarding previous domestic difficulties. The instances which are the subject of appellant's complaint were remote transactions between third parties and the deceased wife. Connection to appellant's state of mind at the time of the crime was nonexistent. If anything, the trial court permitted the appellant greater latitude than was reasonable in presenting evidence from third persons as to their problems with Marlene. Certainly, the trial court did not abuse its discretion with regard to those instances of which the appellant complains.

## III. THE PSYCHIATRIST/PATIENT PRIVILEGE

Appellant utilized the services and testimony of a psychiatrist to testify in support of his claim that he acted under extreme emotional disturbance. On cross-examination the Commonwealth pursued the same line of inquiry as used by defense counsel on direct, only with more details about the statements that appellant made to the psychiatrist describing the events of the night of the murder.

KRS 421.215(2) sets out the psychiatrist-patient privilege, and its limitations. It is "a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental condition...."

In this case there was no refusal to disclose. On the contrary, the appellant called the witness, called for the disclosures, and made no objections to the cross-examination pursuing the same subject. The privilege was intentionally disregarded as a matter of trial tactics.

■ In Kentucky the psychiatrist-patient privilege is placed "upon the same basis as that provided by the law between attorney and client." *See Southern Bluegrass Mental Health v. Angelucci,* Ky. App., 609 S.W.2d 931 (1980). The privilege has no application in the present circumstances.

## IV. THE BURGLARY CHARGE

Appellant claims that he was entitled to a directed verdict on the burglary charge because he had formerly shared occupancy of the premises. His position is that the house was first rented as an abode for him and his wife, that he had occupied it with her during their marriage except for the periods when they were estranged, and that, therefore, he had a legal right to be on the premises, regardless of proof that on the night in question he forcibly broke into the house against the occupant's wishes.

He claims that in these circumstances he was entitled to a directed verdict on the

burglary charge, and, further, that the burglary charge could not be an aggravating factor for the death penalty.

The evidence was that the house in question was owned by the victim's brother and rented to her, to be used as a marital abode when the parties were not separated. The appellant was under a court order issued in connection with the sexual abuse charge, previously discussed, to stay away from the premises.

■ We reject the position that there is any absolute right on the part of one spouse to be with the other against the other's wishes, giving a right to break into the home of the other with the intent to commit a crime. We adopt the position of the Florida court in *Cladd v. State,* Fla., 398 So.2d 442 (1981), of the Ohio court in *State v. Herrin,* 6 Ohio App.3d 68, 453 N.E.2d 1104 (1982), and of the Washington court in *State v. Schneider,* 36 Wash.App. 237, 673 P.2d 200 (1983), all of which hold that burglary is an invasion of the possessory property right of another and extends to a spouse. As stated in *Cladd v. State:*

"[W]here premises are in the sole possession of the wife, the husband can be guilty of burglary if he makes a nonconsensual entry into her premises with intent to commit an offense." 398 So.2d at 444.

## V. MULTIPLE MURDER AS AN AGGRAVATING FACTOR JUSTIFYING THE DEATH PENALTY

Appellant claims that the evidence did not sustain multiple murder as an aggravating factor justifying the death penalty and that the jury's findings on this point were insufficiently stated.

The thrust of the appellant's argument in this respect is directed at the verbiage used by the jury to express the verdict.

KRS 532.025(2)(a)(6) lists multiple murder as an aggravating circumstance justifying the death penalty in these words:

"The offender's act or acts of killing were intentional and resulted in multiple deaths."

The fact that the killings were intentional and multiple is not in dispute. What causes the dispute is the hiatus in time between the two deaths and the words used to express the findings of the jury as to aggravating circumstances. The argument is, to say the least, hypertechnical.

■ The jury was instructed that as a precondition to recommending the death penalty for multiple murders, it must find:

"(a) That the defendant's act or acts in killing Mary Marlene Matthews and Magdalene Cruse were intentional and resulted in the death of both Mary Marlene Matthews and Magdalene Cruse."

Utilizing the forms of verdict provided, the jury filled in a finding as to *both* victims, Marlene Matthews and Magdalene Cruse, stating that the defendant's act or acts in killing the victims was intentional and resulted in the death of the named victim, but not both victims.

It is clear from the form of the verdict when considered in connection with the words of the instruction, that the finding was one of intentional murder as to both victims, resulting in multiple deaths.

■ Although we think the finding plain enough on its face that no clarification was necessary, had defense counsel had any question as to the meaning of the jury's findings, it was incumbent upon counsel to object to the form of the verdict and ask for clarification. *Crump v. Commonwealth,* 215 Ky. 827, 287 S.W. 23 (1926).

Another of appellant's arguments in connection with the findings of intentional murder is that the evidence was insufficient to prove absence of emotional disturbance.

■ While it is certainly true that appellant tried hard to make a case for application of the qualifying phrase, "acting under the influence of extreme emotional disturbance" as set out in KRS 507.020(1)(a), by presenting extensive evidence of preexisting serious domestic problems and through the testimony of a psychiatrist, it

is equally true that the evidence regarding appellant's conduct before, during and after the crimes was more than sufficient to support the jury's findings of capital murder. It is not necessary for the Commonwealth to produce direct evidence, by confession or otherwise, of absence of extreme emotional disturbance. *See Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 107 (1980).

 The proof that appellant was acting under the influence of extreme emotional disturbance was far from overwhelming. In addition to the circumstances of the crime, the proof was that when he returned to his mother's house after the crime, about 6:00 to 6:30 a.m., he took steps to hide the gun and clean his clothes. Shortly thereafter, he gave a false statement to the police.

We have recently written on this subject in *Wellman v. Commonwealth*, Ky., 694 S.W.2d 696 (1985), clarifying that absence of extreme emotional disturbance is not an element of the crime of murder which the Commonwealth must affirmatively prove. The trial court's instructions in regard to extreme emotional disturbance were adequate, and the proof supported the jury's findings of intentional murder.

## VI. USING THE WORD "RECOMMEND" IN CONNECTION WITH THE JURY'S FUNCTION IN IMPOSING THE DEATH PENALTY

KRS 532.025(1)(b) states in pertinent part:

"Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law."

Since the statute uses the word "recommend," the judge does no more than follow the language of the statute when he uses the same word in the instructions to the jury.

We are aware of the recent decision of the United States Supreme Court in *Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Caldwell*, the Supreme Court reversed and ordered a new trial where the prosecutor, over defense counsel's objection, advised the jury that "the decision you render is automatically reviewable by the Supreme Court." The holding is that even though such a statement is a correct statement of the law, the prosecutor must not seek "to minimize the jury's sense of responsibility for determining the appropriateness of death." To do so results in a constitutionally impermissible violation of the U.S. Constitution Eighth Amendment's prohibition against cruel and unusual punishments.

The Concurring Opinion in *Caldwell v. Mississippi, supra*, by Justice O'Connor clarifies its application. It makes clear that the problem in *Caldwell* was that the words of the instruction, though correct, when coupled with "the prosecutor's misleading emphasis on appellate review," left the jury with "the impression that the appellate court would be free to reverse the death sentence if it disagreed with the jury's conclusion that death was appropriate."

 Thus, we conclude that although in this area the court and prosecutor must be extremely careful to avoid leaving the jury with any impression that would diminish its "awesome responsibility" in imposing the death sentence (*McGautha v. California*, 402 U.S. 183, 208, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711 (1971)), use of the word "recommend" is not per se constitutionally impermissible. It is not incorrect as long as the context in which it is used does not mislead the jury as to its role in the process or its responsibility in exercising its sentencing function.

 We note, with approval, that in the present case the prosecutor said nothing to diminish the jury's sense of responsibility in imposing the death penalty. On the contrary, the prosecutor referred to the jury's responsibility as "a very heavy bur-

den," and asked the jury for "a verdict, a penalty of death by electrocution." He stated that "the facts you heard ... warrant a death sentence." The prosecutor's remarks charged the jury with its responsibility, rather than diminishing it.

During closing argument of defense counsel, a colloquy took place regarding use of the word "recommendation" in the instructions. It was an exchange precipitated by the defense counsel's overstatement of the jury's function, not the prosecutor's understatement of the jury's role, and clarified by the court in an appropriate manner. We see no possibility of error or prejudice from this exchange.

Unlike *Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984), cited by the appellant in support of his claim of error, here the prosecutor did not misuse the term recommend in a manner that could have been misleading to the jury. The conduct of the prosecutor in the present case was well within the bounds of propriety. Although a prosecutor must be extremely careful to avoid any remarks which could mislead the jury as to its role in the sentencing process, there was no impropriety here.

### VII. APPELLANT'S CLAIM THAT THE JURY WAS INADEQUATELY IN-STRUCTED REGARDING PAROLE

■ During the penalty phase of the jury's deliberations, the jury sent a note to the court asking questions about parole in the event of a sentence of life imprisonment or a term of years. Appellant's counsel requested that the jury be instructed that "they are to presume that the defendant would serve whatever sentence is given by the court." Such an instruction would have been substantively incorrect.

■ Instead, the court instructed the jury that these "are questions which the court cannot instruct you upon." It then told the jury to "consider the court's instruction (as) given to you, and see if you can reach a verdict." The instruction as given by the court conformed to the directions of this Court in *Blanton v. Com-*

*monwealth*, Ky., 429 S.W.2d 407 (1968). We said:

"[W]hen the trial court is asked concerning parole, we say again that the court should refrain from commenting upon it at all and should direct the jury to reach a verdict upon the evidence and instructions it had previously heard." *Id.* at 411.

Although *Brown v. Commonwealth*, Ky., 445 S.W.2d 845, 848 (1969) specifies that the jury may also be told "that the subject of parole is not to be given any consideration by them in performing their functions," we have never said that this additional comment is necessary, and it is pure speculation as to whether, if made, such a comment would benefit or harm the defendant's case. It is a matter for the trial court's discretion to decide whether this further comment would be helpful to the jury in understanding its function in carrying out the instructions.

We conclude that the jury was adequately instructed after it asked questions concerning parole.

### VIII. DID THE TRIAL COURT USE IM-PROPER AND ERRONEOUS CON-SIDERATION IN IMPOSING SEN-TENCE?

In the "Report of the Trial Judge," required by KRS 532.075(1), item 12 on p. 9 provides a space for "general comments of the trial judge concerning the appropriateness of the sentence imposed in this case." The trial judge wrote into the space:

"There was substantial evidence to support the jury's recommendation. It is indicated that the defendant's acts were intentional and he feels no remorse."

It is the appellant's position that this comment to the effect that he "feels no remorse" is incorrect and that it constitutes an impermissible use of a nonstatutory aggravating circumstance in imposing the death penalty.

Appellant also calls attention to the trial court's statement at the time of imposing sentence, to the effect that the court's rec-

ollection of the testimony of the defense psychiatrist was that "he said the defendant had no remorse for the offenses which he committed, and that if these same set of circumstances should develop again, the defendant's reaction might be the same as previously."

██ We have reviewed the psychiatrist's testimony on this point. It is ambivalent. At one point, however, the psychiatrist states:

"[I]n my interviews of Davie (the appellant), he has not expressed to me any obvious guilt for what he had done about this. He did not feel any remorse or any obvious guilt about it. If there has been any, I haven't seen it."

The trial court's conclusion regarding lack of remorse was not unreasonable.

██ More importantly, considering the whole record, it is obvious that remorse, or the lack of it, was a small, noncritical element in the trial court's decision to accept the jury's recommendation and impose the death penalty. Considered in context, the trial court's views regarding remorse, or the lack of it, had no bearing on the imposition of the death penalty.

██ Next, appellant argues that considerations regarding remorse, or the lack of it, are a nonstatutory aggravating factor which must not be considered at all in imposing the death penalty. We conclude from KRS 532.025 that the trial court's function in imposing the death penalty following a jury verdict is different from its function where no jury is involved. KRS 532.025(1)(a) states:

"In cases in which the death penalty may be imposed, the judge *when sitting without a jury* shall follow the additional procedure provided in subsection (2) of this section." (Emphasis added.)

Subsection (2) is the procedure under which statutory "aggravating circumstances" are listed.

But, KRS 532.025(1)(b) is the procedure "[i]n all cases in which the death penalty may be imposed and which are tried by a jury." It specifies that the *jury* (not the judge) shall consider statutory aggravating circumstances, and the jury must make a finding of at least one such aggravating circumstance before imposing the death penalty.

It clearly distinguishes the role of the judge when there is a jury, with this sentence:

"Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law."

The limits prescribed by law are those limits specified in KRS 532.030(1), which states:

"When a person is convicted of a capital offense he shall have his punishment fixed at death, or at a term of imprisonment for life without benefit of probation or parole until he has served a minimum of twenty-five (25) years of his sentence, or to a sentence of life, or to a term of not less than twenty (20) years."

This statutory scheme makes it clear that in exercising his sentencing discretion, the trial court is not limited to statutory aggravating circumstances. United States Supreme Court requirements of specified statutory aggravating circumstances before imposition of the death penalty are satisfied by our death penalty statute in jury cases by requiring a finding of specified statutory aggravating circumstances from the jury. Cases cited by the appellant, decided in circumstances where the jury has not found statutory aggravating circumstances and imposed the death penalty, are inapposite. In the present circumstances, the statutory scheme not only permits, but anticipates, that the trial court will play a separate and different role in sentencing in capital cases after the jury's verdict has been received.

We find no error in the conduct of this case and the trial court that justifies reversal.

### REVIEW OF SENTENCE

██ Next, we must perform our duties in review of a death sentence as mandated by KRS 532.075.

We find nothing in the record that suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence supports the jury's finding of statutory aggravating circumstance enumerated in KRS 532.025(2). The sentence of death is not excessive or disproportionate to the penalty that has been imposed in similar cases, considering both the crime and the defendant.[1]

It is obviously difficult to compare circumstances in one murder case with circumstances in another and arrive at a minimum standard of heinousness that puts a particular murderer in the class qualifying for the death penalty. For this case, it suffices to say that we have conducted an independent review of the circumstances and conclude that appellant's murder of his estranged wife and his mother-in-law in the circumstances of this case far exceeds any minimum threshold justifying capital punishment.

Appellant's sentence is not excessive or disproportionate to the penalty imposed in these other cases.

The judgment is affirmed.

All concur.

1. We have compiled data since 1970 in those cases where a death penalty has come before this Court for review, considering both aggravating and mitigating circumstances in those cases and comparing them with the present case. The cases we have considered are:

1) *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384 (1985).
2) *Ward v. Commonwealth,* Ky., 695 S.W.2d 404 (1985).
3) *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985).
4) *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985).
5) *White v. Commonwealth,* Ky., 671 S.W.2d 241 (1984).
6) *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984).
7) *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984).
8) *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980).
9) *Smith v. Commonwealth,* Ky., 599 S.W.2d 900 (1980).
10) *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980).
11) *Boyd v. Commonwealth,* Ky., 550 S.W.2d 507 (1977).
12) *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977).
13) *Self v. Commonwealth,* Ky., 550 S.W.2d 509 (1977).
14) *Lenston v. Commonwealth,* Ky., 497 S.W.2d 561 (1973).
15) *Scott v. Commonwealth,* Ky., 495 S.W.2d 800 (1973).
16) *Tinsley v. Commonwealth,* Ky., 495 S.W.2d 776 (1973).
17) *Galbreath v. Commonwealth,* Ky., 492 S.W.2d 882 (1973).
18) *Caine v. Commonwealth,* Ky., 491 S.W.2d 824 (1973).
19) *Caldwell v. Commonwealth,* Ky., 503 S.W.2d 485 (1972).
20) *Leigh v. Commonwealth,* Ky., 481 S.W.2d 75 (1972).
21) *Call v. Commonwealth,* Ky., 482 S.W.2d 770 (1972).