Brenda SMITH, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 93–SC–724–MR.

Supreme Court of Kentucky.

June 8, 1995.

Rehearing Denied Sept. 21, 1995.

Russell J. Baldani, Baldani, Rowland & Richardson, Lexington, for appellant.

Chris Gorman, Atty. Gen., David E. Spenard, Asst. Atty. Gen., Criminal Appellate Div., Office of the Atty. Gen., Frankfort, for appellee.

LAMBERT, Justice.

This appeal is from the final judgment of the Floyd Circuit Court whereby appellant was found guilty of manslaughter in the first degree for the beating death of her 72–year–old husband, Simson "Smitty" Smith. At the time of his death, appellant and Smith had been married for about two years and she was twenty-one years of age.

As appellant makes no claim of insufficiency of evidence to sustain the jury verdict, it is unnecessary to extensively discuss the evidence. For our purposes, it is sufficient to state that on the afternoon of May 6, 1992, appellant called an ambulance to her trailer after discovering that Smitty had stopped breathing. Thereafter, appellant gave several versions of the events, but it appeared that she had severely beaten her husband the night before and he lay dead in the trailer. The coroner observed abrasions on the top of the victim's head and extensive bruising and abrasions on his face. A hatchet or "shingle hammer" found lying nearby appeared to match those injuries. The victim suffered cuts and bruises on his shoulder, buttocks, leg and scrotum as well as "defensive-type" wounds. According to the pathologist who performed the autopsy, the cause of death was acute peritonitis caused by the production of bacteria due to abdominal bleeding. The abdominal bleeding was caused by blunt trauma to the abdomen which severed the victim's small intestine by forcing it into his spine. Hair similar to that of the victim was found on two wooden handles discovered at the scene, as well as on some rope and on the rear quarter panel, rear tire axle, and the rear rocker panel of appellant's car. The foregoing suggested that appellant had run over the victim with her car. Such additional facts as may be necessary to an understanding of the legal issues will be presented as each issue is discussed.

Appellant first claims prejudicial error in her cross-examination by the Commonwealth which revealed her lesbian relationships with Laura Meade and with other women. The Commonwealth responds that appellant opened the door to such cross-examination by her provocative testimony, and by her blame of Laura Meade for her conflict with her husband and for some of the prior injuries inflicted upon him. Prior to trial, appellant had moved *in limine* and was granted an order by which evidence of her sexual orientation would be excluded.

During the Commonwealth's evidence in chief, there were no references to appellant's sexual orientation. However, during appellant's evidence in chief and during her testimony on her own behalf, she made repeated references to one Laura Meade, a person she identified as a distant cousin. Appellant revealed that until a few months prior to the victim's death, Laura Meade had lived in the house with her and her husband. She stated that the victim and Laura did not want each other around and that she felt caught in the middle and like a "prisoner" in her own home. She acknowledged that her discord with her husband was mostly over Laura and that things were going on that he did not like. She mentioned instances of Laura striking her husband. Throughout her testimony on direct examination and prior to any mention of a sexual relationship between them, appellant portrayed Laura Meade as a dominating presence and her name was often mentioned unresponsively and gratuitously. She was presented as having had a profound influence on the lives of appellant and her husband. Appellant's preoccupation with Laura Meade was palpable.

On cross-examination, the references to Laura Meade continued. Appellant stated

that Laura controlled the household, that she felt like a hostage, and that Smitty either did or did not want to throw Laura out of the house. Appellant testified that Laura was mean to her and to Smitty. Along the way, the Commonwealth inquired as to how many bedrooms there were in the trailer and on being told that there were three, the question was asked whether each of the three persons living there had his or her own bedroom. When this question was answered in the negative, the Commonwealth asked where Laura slept and appellant answered, "Usually with me." The next question was why Laura did not sleep in the other bedroom and appellant proclaimed "Because we were lovers." During the remainder of her testimony on cross-examination, appellant made numerous references to Laura Meade. Among other things, she stated that Laura stole money from her and threatened to "blow her brains out" if she declined to give her more money. In sum, it would be difficult to overstate the importance appellant ascribed to Laura Meade during the time they lived together. She dominated virtually every aspect of appellant's life. On this appeal, however, appellant cries foul because the Commonwealth asked questions which led to the revelation of her intimate relationship with Laura Meade.

■ Ordinarily, evidence of marital infidelity would be inadmissible on grounds that it lacks relevance and amounts to a "smear" upon the defendant's character. Such was the holding in *Barnett v. Commonwealth*, Ky., 763 S.W.2d 119 (1988), wherein we reversed in part on the admission of evidence of an extramarital affair which had ended twenty-one months before the murder and otherwise lacked any connection with the crime. Likewise, in *Stallings v. Commonwealth*, Ky., 556 S.W.2d 4 (1977), we found reversible error in the trial court's admission of evidence of the shooting death of the defendant's first wife and his illicit love affair with his second wife prior to the first wife's death. Appellant is correct in her contention that evidence of marital infidelity which lacks legitimate connection to the crime charged amounts to an attack upon the defendant's character and results in prejudicial error. *Pruitt v. Commonwealth*, Ky.App., 487

S.W.2d 940 (1972); *Brown v. Commonwealth*, Ky.App., 275 S.W.2d 928 (1955); and *Acres v. Commonwealth*, Ky.App., 259 S.W.2d 38 (1953).

■ However, in this case, appellant herself established a sufficient connection to permit admission of the Laura Meade evidence. Throughout her testimony on direct, Laura Meade was presented as a dominating figure who controlled virtually every aspect of appellant's life during the time they lived together. By this means, appellant sought to explain some of the acts of physical abuse inflicted on Smitty by her and by Laura. She also blamed Laura for the conflict in her marriage. In an effort to diminish her own responsibility, she portrayed herself as a victim of Laura Meade and this portrayal was in harmony with the theme of her defense, i.e. that she had been a lifelong victim and that only Smitty had treated her with love and decency rendering it impossible for her to have intended him harm.

■ With the evidence in this state, there can be no doubt that appellant opened the door to a reasonable inquiry into the means by which Laura Meade exercised such a profound influence over her. One may not portray another as having dominated his life and thereby diminished his own responsibility without explaining how such domination was accomplished. If it were otherwise, a defendant could always demonize some other person or circumstance but escape any testing of the credibility of his assertions. In *Copley v. Commonwealth*, Ky., 854 S.W.2d 748 (1993), we held that one who went into great detail to explain previous incidents and how they affected his state of mind at the time of the shooting had opened the door to rebuttal evidence on the collateral issues. We noted the considerable discretion of the trial court in such circumstances. *Id.* at 752. In *Harris v. Thompson*, Ky., 497 S.W.2d 422 (1973), the Court observed that one who opens the book on a subject is not in a position to complain when his adversary seeks to read other verses from the same chapter and page. Upon a thorough examination of appellant's testimony, we have no doubt that the Commonwealth was entitled to reason-

ably explore her personal relationship with Laura Meade to rebut her claim of diminished responsibility. The jury was entitled to see the entire picture, not just the self-serving portion appellant sought to reveal. When proper cross-examination reveals conduct which may be stigmatized, that alone is not grounds for its exclusion. *Dyer v. Commonwealth,* Ky., 816 S.W.2d 647 (1991).[1]

Illustrative of the lengths to which courts have gone to permit attack upon self-serving testimony is *United States v. McRae,* 593 F.2d 700 (5th Cir.1979), in which evidence was properly admitted that the defendant had engaged in intimate relations with a woman two months *after* his wife's death. This was held to rebut his testimony of intense devotion to his wife and grief over her death.

> In view of his emphasis on his desolation at her death and on his undying devotion, we cannot say that an abuse of discretion occurred in the admission of this [other woman] rebuttal evidence.

*Id.* at 708.

In addition to the evidence revealed on cross-examination as to appellant's relationship with Laura Meade, later in her cross-examination appellant volunteered that she had been "involved" with someone else. Her testimony was ambiguous as to whether the involvement was of a sexual nature. In any event, the evidence was not initially in response to a leading question and there was no objection.

■ Finally, in the course of a spirited cross-examination as to what transpired on the night Smitty was beaten, appellant acknowledged having been discovered by Smitty "hugging" another man. She was then asked with whom else she was having sex while married to Smitty and just before his death. In response, she named two other women. Inasmuch as the event which trig-

gered the beating of Smitty was his discovery of appellant in the embrace of another man and in the context of cross-examination concerning those events, we cannot say that the trial court abused its discretion. In any event, if there was error, it was harmless. RCr 9.24.

■ Appellant next claims prejudicial error in the admission of an affidavit executed by the decedent in support of his claim for a domestic violence petition. Approximately one year before his death, Smitty signed an affidavit which was read to the jury at trial and in which he stated with reference to appellant, "She likes to abuse me." Appellant contends that on this point this case is indistinguishable from *Barnes v. Commonwealth,* Ky., 794 S.W.2d 165 (1990), in which we reversed.

The affidavit in support of the domestic violence petition was not presented until after appellant had testified on her own behalf. As stated heretofore, she had testified that her domestic circumstance was generally harmonious and that Laura Meade was the cause of the discord between her and Smitty. To rebut this evidence, the Commonwealth introduced the decedent's statement made at the time Laura Meade was living in the household to the effect that appellant enjoyed abusing him. In his statement there was no mention of Laura Meade.

During its evidence in chief, the Commonwealth had produced evidence of appellant's abuse of the decedent in an effort to establish a pattern of abuse which culminated in the murder. *Francis v. Commonwealth,* Ky., 468 S.W.2d 287 (1971). The timing of the statement, while considerably before the date of death, was contemporaneous with other Commonwealth evidence regarding appellant's pattern of abuse. As such, this case more nearly resembles *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1985), than *Barnes v. Commonwealth, supra.* Although

---

1. In *Dyer,* the Commonwealth introduced a multitude of unrelated and inflammatory pornographic materials to prove that the defendant was guilty of having a "pedophilic" disposition. Introduction of such stigmatized behavior was irrelevant and extremely prejudicial. "It is obvious the real purpose, the sole purpose, of this evidence was, in general, to prove the appellant

was a sexual pervert...." *Id.* at 652. In the present case, no attempt was made to label appellant as guilty of the crime based on sexual preferences or misconduct. Such evidence arose only as it was relevant to rebut her assertions, and was not unduly prejudicial in view of the entire case against appellant.

*Matthews* involved the introduction of warrants for a previous burglary and alleged sexual abuse of the victim's daughter, we held that such evidence was admissible as it related to both state of mind of the appellant as well as being "part of the immediate circumstances bearing on the crimes charged." *Matthews,* 709 S.W.2d at 418. Moreover, it should not be overlooked that the Commonwealth had produced evidence from at least three witnesses as to appellant's physical attacks and infliction of injury upon the victim. She admitted as much in her own testimony and in such circumstances admission of the victim's very brief statement was within the trial court's discretion.

■ Appellant next claims prejudicial error in the admission of uncharged acts of misconduct. At trial the Commonwealth produced evidence from various witnesses as to acts of physical abuse of the victim. Two such witnesses testified that within six months of his death they had seen appellant beat Smitty, and two other witnesses merely reported their observation of Smitty with black eyes and bruises. Appellant makes no serious contention that the evidence from eyewitnesses as to her beatings of Smitty should have been excluded and we believe any such contention would border on absurdity. In fact, Tracey Owens and Joey Hicks each testified that they observed appellant physically abuse the victim relatively close in time to his death by means of similar physical abuse. *See O'Bryan v. Commonwealth,* Ky., 634 S.W.2d 153 (1982), and *Adcock v. Commonwealth,* Ky., 702 S.W.2d 440 (1986). On the question of remoteness, *Barnes v. Commonwealth* is distinguishable.

■ A more difficult question concerns the admission of other evidence that appellant had been beaten but without any direct evidence as to who had done the acts. Reba Slone and Roger Hicks testified to having seen appellant in a beaten condition but did not see who had done it. Appellant claims such evidence invites the jury to speculate that she committed the unwitnessed beatings.

At the outset, evidence of the non-fatal beating of the victim close in time to the fatal beating was surely relevant. When such evidence is coupled with other evidence that in the same time period appellant administered beatings to the victim, an inference would arise that appellant was guilty of the unwitnessed beatings. In *United States v. Harris,* 661 F.2d 138 (10th Cir.1981), the court held that the jury was entitled to infer that a father was guilty of unwitnessed child abuse by virtue of evidence which tended to exclude other possible explanations for the injuries sustained. The court noted that the child's injuries were not sustained in a fall and that other persons such as baby-sitters had not abused the child and concluded that by virtue of the elimination of other possibilities, an inference arose that Harris, who was a frequent custodian, was guilty of the abuse. *Id.* at 141–42. While this case is not as compelling as *Harris,* there are similarities. First, during the period of abuse, appellant and the victim lived together and she thus had the opportunity. He was elderly and other evidence showed that she had abused him on several occasions close in time to the unwitnessed abuse. Evidence in such a state would permit the jury to infer that appellant was guilty of the unwitnessed acts of abuse.

Such evidence may be admissible, in the trial court's discretion, provided that some relationship to the charged crime is shown. In *Francis v. Commonwealth,* Ky., 468 S.W.2d 287 (1971), this Court held that "[w]hile the prosecution is not privileged to show unconnected and isolated conduct that had no bearing whatsoever upon the crime under scrutiny, yet all the circumstances may be shown which have a relation to the particular violation of the law imputed, even if, in doing so, other offenses may be brought to light." *Id.* at 289. While evidence of prior physical attacks on Smitty was prejudicial to the appellant, the question is whether its admission was unfairly prejudicial. From the totality of the evidence, we are unable to conclude that the trial court abused its discretion in admission of this evidence. In any event, the abundance of other evidence of appellant's lethal and non-lethal abuse of the victim renders evidence of the unwitnessed acts entirely harmless.

Appellant's claims of error with respect to the admission of photographs and denial of a

continuance have been examined and found to be without merit. The issues raised addressed themselves to the sound discretion of the trial court and no abuse of discretion has been shown in the rulings thereon.

For the foregoing reasons, the judgment is affirmed.

REYNOLDS, SPAIN and WINTERSHEIMER, JJ., concur.

STEPHENS, C.J., dissents by separate opinion in which STUMBO, J., and SCOTT FURKIN, Special Justice, join.

LEIBSON, J., not sitting.

STEPHENS, Chief Justice, dissenting.

I must dissent from the majority opinion. I would reverse on all three issues discussed by the majority.

First, the majority concludes that appellant opened the door to the questions on cross regarding her sexual relationship with Laura Meade. The majority suggests this is so because appellant introduced on direct examination that Laura Meade was a dominating presence in her life. After reviewing the record, I find that testimony on direct examination regarding Laura Meade was minimal, opening no doors to allow inquiry by the Commonwealth into Brenda Smith's sexual habits.

Mention of Laura Meade first occurred when appellant's attorney was developing a line of questioning about why Brenda had married a man so much older than she was. This particular reference to Laura was included in a response to a question concerning how Smitty treated her. Brenda answered:

Very good.... I could find somebody that I could go talk to when I needed to. I didn't have to worry about being hurt, being abused or nothing.... And, then my cousin Laura wants to stay with me and beat on me all the time. And, half the time make me do things that I don't really want to do.

The next discussion of Laura arose when defense counsel was questioning Brenda about fights she had with Smitty. This line of questioning went as follows:

Question: What were the fights over? What were the arguments over?

Answer: Mostly over Laura. And, about people coming over.

. . . . .

Question: Okay, but Laura was over there and there were some things going on that Smitty didn't like?

Answer: Yes.

. . . . .

Question: Have you ever seen anybody beat on Smitty?

Answer: Yes, I have.

Question: Who have you seen beat on Smitty and leave Mike out at this point? Is there anybody over there besides Mike ever had a fight and beat on Smitty?

Answer: Yes.

Question: Who?

Answer: Laura.

. . . . .

Question: ... They've gotten in fights over what?

Answer: Over different things. Laura didn't want Smitty there. Smitty didn't want Laura there. And, I was caught in the middle either way I went.

Question: You were his wife. Why didn't you control the situation and keep everybody out of that place that he didn't like?

Answer: I couldn't. I tried. If I done something that I wouldn't suppose[d] to, once you had people around there, I've went around, I had stay in the trailer for one week 'cause my eyes were swelled together so black that I couldn't even see because of Laura. I couldn't do anything. Me and my husband were prisoners in our own home.

These are the only references to Laura Meade that I find in the record with the exception of one more time asking about Laura's moving out. In fact, these are the only discussions of Laura Meade in over 70 pages of direct examination in the transcript. Substantively, I find that these references, in their totality, present no need to investigate appellant's sexual relationship with Laura. Since the testimony from both parties clearly

indicates that Laura was not implicated in the murder of Smitty, allowing the testimony in regarding Brenda's sexual orientation could only serve an impeachment purpose. "No authority ... suggests that homosexuality indicates a propensity to disregard the obligation of an oath." *United States v. Provoo,* 215 F.2d 531 (2d Cir.1954).

More importantly, however, is the fact that *Barnett v. Commonwealth,* Ky., 763 S.W.2d 119 (1988), is directly applicable in this case. The admission of this testimony clearly results in the admission of bad character evidence when character has not been put at issue. *Barnett v. Commonwealth,* Ky., 763 S.W.2d 119 (1988).

I also find that, even if one could hold that the door had been opened to the admission of this evidence, the repeated questions asked by the Commonwealth regarding Brenda's sexual preferences and sexual relationships with women other than Laura Meade reached a point where they were far more prejudicial than probative. On these grounds alone, a reversal is warranted.

Second, the majority concludes that appellant did not suffer prejudicial error when the affidavit was admitted. The statement in the affidavit, "she likes to abuse me" is classic hearsay to which no exception applies. This court has repeatedly held that the "hearsay rule forbids the use of an assertion, made out of court, as testimony to the truth of the fact asserted...." *Davis v. Bennett's Adm'r,* 279 Ky. 799, 132 S.W.2d 334, 338 (1939).

There is nothing about this statement that indicates a need for the testimony and supports its trustworthiness so as to permit admission under an exception. The facts indicate, first, that other testimony was presented at trial to support a theory of Brenda's abuse of her husband. Second, it is clear also that the affidavit was withdrawn when Smitty did not appear for court. This could possibly suggest that the trustworthiness of the statements were questionable. On these grounds, I believe reversal is necessary.

Third, I would reverse because the admission of evidence regarding seeing Smitty with black eyes and bruises was extremely prejudicial to appellant. The most obvious inference to be drawn from this testimony is that appellant was responsible for these bruises. No exception to the uncharged crimes evidence rule applies. KRE 404(b); *O'Bryan v. Commonwealth,* Ky., 634 S.W.2d 153 (1982). The eyewitnesses testifying to these bruises had no knowledge of how they were inflicted. Further, no other evidence was presented that connected the bruises to appellant.

As a result of the foregoing, I would reverse appellant's conviction and remand for a new trial.

STUMBO, J., and SCOTT FURKIN, Special Justice, join in this dissenting opinion.